**Ervin Albert HAAS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 17873.**

United States Court of Appeals
Eighth Circuit.

April 12, 1965.

J. Roger Edgar and James W. Singer, III of Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., made argument for appellant and filed brief with Ramon J. Morganstern of Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo.

Donald L. Schmidt, Asst. U. S. Atty., St. Louis, Mo., made argument for appellee and Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., was with him on the brief.

Before VOGEL, RIDGE and MEHAFFY, Circuit Judges.

VOGEL, Circuit Judge.

Ervin Albert Haas, defendant-appellant herein, was convicted in the United States District Court for the Eastern District of Missouri with having violated 18 U.S.C.A. § 2113(a), in that on or about September 2, 1964, by force and violence and by intimidation he took from Judith Janos, an employee of the Bissell Hills Branch of Hamiltonian Federal Savings and Loan Association approximately $1,396 belonging to the Hamiltonian Federal Savings and Loan Association, which was a Federal Savings and Loan Association authorized and acting under the laws of the United States, the accounts of which were insured by the Federal Savings and Loan Insurance Corporation. Upon conviction by a jury and a sentence of 20 years' imprisonment, Haas, through court-appointed counsel, prosecuted this appeal.

Prior to trial defendant filed a motion for return of property and to suppress evidence pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. The basis of his motion was that certain enumerated property was taken from a room rented by him at 737 Limit Street, University City, Missouri on the evening of September 3, 1964, in violation of his rights under the Fourth Amendment to the Constitution of the United States. Hearing on the motion was held by the District Court on October 16, 1964. Testimony offered at the hearing indicated the following: Mrs. Molly Larner owned a six-apartment building at 737 Limit Street in University City, Missouri, and that in the latter part of August 1964 she placed an advertisement in the newspapers stating that she had a room in her apartment for rent. The defendant answered the advertisement on Sunday August 30, 1964, and at that time rented the room on a month to month basis. He moved in immediately. Mrs. Larner described the room rented to the defendant as follows:

"Q. So he started living in that room in your apartment on that same day, on Sunday?

"A. The same day.

"Q. Can you describe where that room is situated in respect to your apartment?

"A. Well, my apartment is straight rooms. The living room, you come in from the hall in the living room.

"Q. Yes?

"A. After is the dining room, then the bedroom, that is the room he has got, the bedroom, the back bedroom.

"Q. As you enter the door to your apartment, that is the living room?

"A. Yes.

"Q. Next to that is the dining room?

"A. Yes.

"Q. And you have a little corridor off the dining room?

"A. Just a little hall you walk in.

"Q. And beyond that was the room that he rented?

"A. Yes.

"Q. In your apartment.

"A. Yes."

William K. Bock, Special Agent, FBI, testified that on the afternoon of September 3, 1964, in company with two other officers, he waited in the living room of Mrs. Larner's apartment. He did not go into the room rented by the defendant at that time. They saw the defendant coming up the walk to the house. He opened the door and entered the living room, whereupon Bock identified himself, told the defendant that a warrant had been issued for his arrest in connection with the Hamiltonian Savings and Loan robbery, that any statement he made could be used against him in court, and of his right to have an attorney prior to making any statement. Defendant was searched and handcuffed, whereupon the officers took him from the living room in which the arrest was made to the room in the back which the defendant had rented, the door to which was completely open. Therein they found and took from the closet a gray suit that generally fit the

description of the clothing worn by the robber, a black zipper brief case which had the writing on it "R and G Food Club" which fit the description of the briefcase carried by the robber, a small gas gun which the defendant had advised them was in one of the dresser drawers and which fit the description of the gun used by the robber. They also found and took some pieces of notepaper and a carbon copy of a rental agreement for the rental of an automobile, a white Chevrolet, from Budget Rent-A-Car. They also found a deposit slip reflecting an $800 deposit on account No. 738138 at the North County Bank and Trust Company dated September 2, 1964.

This witness brought out that the only way you could get into the bedroom rented by the defendant was to walk through the living room, the dining room and a hallway of about five or six feet and then into the bedroom. Arrest of the defendant was made pursuant to a proper arrest warrant but search of the premises was without a search warrant. There is no evidence that the defendant consented to the search of his room and the evidence is positive that the officers did not search it until after the defendant had been arrested in the living room with warrant for arrest and told the reason therefor.

On October 26, 1964, the trial court overruled defendant's motion to suppress the evidence obtained through the search of his room and trial before a jury began on November 2nd. During the trial the government introduced into evidence the articles and clothing found and taken from the defendant's room on September 3, 1964. Defendant was identified by the teller at the Savings and Loan Association who was held at gunpoint during the robbery. This witness also gave corroborative testimony with reference to the suit worn by the robber at the time of the commission of the crime, the use of a black zipper briefcase with "R and G Food Club" thereon, and the use of a gun at least similar in appearance to the one taken from his room. A bank teller employed at the North County Bank identified the defendant as the Ervin A.

Haas who had deposited $800 in currency in his account at such bank on the afternoon of the robbery shortly after its occurrence. Other testimony indicated the rental by the defendant of a white Chevrolet answering the description of the vehicle used by the robber after commission of the crime. Defendant did not testify and offered no testimony in his own behalf.

Defendant does not contend that his arrest was illegal but that the search following his arrest was a violation of his rights under the Fourth Amendment and that the trial court erred in denying the motion to suppress. The prohibition of the Fourth Amendment is against "unreasonable searches and seizures". Defendant cites first the recent case of Preston v. United States, 1964, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777. That case involved the search of the defendant's motor car and the seizure therefrom of a number of articles, including guns, masks and other equipment which might be used in the commission of crime. The petitioner and his associates had been arrested for vagrancy, searched for weapons and taken to police headquarters. Their automobile had not been searched at the time of the arrest but had been driven by an officer to the police station and then towed to a garage. Thereafter some of the police officers went to the garage, searched the car and found the guns, etc. The court there held at page 884 of 84 S.Ct. at page 781 of 11 L.Ed. 2d:

" * * * that the search was too remote in time or place to have been made as incidental to the arrest and conclud[ed], therefore, that the search of the car without a warrant failed to meet the test of reasonableness under the Fourth Amendment, rendering the evidence obtained as a result of the search inadmissible."

In so holding, the court, however, said at page 883 of 84 S.Ct., at pages 780–781 of 11 L.Ed.2d:

" * * * Unquestionably, when a person is lawfully arrested, the police have the right, without a

search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime. Weeks v. United States, 232 U.S. 383, 392 [34 S.Ct. 341, 344, 58 L.Ed. 652, 655, L.R.A. 1915B, 834] (1914); Agnello v. United States, 269 U.S. 20, 30 [46 S.Ct. 4, 5, 70 L.Ed. 145, 148, 51 A.L.R. 409] (1925). *This right to search and seize without a search warrant extends to things under the accused's immediate control,* Carroll v. United States, supra, 267 U.S. [132] at 158 [45 S.Ct. 280, at 287, 69 L.Ed. 543, at 553], and to an extent depending on the circumstances of the case, to the place where he is arrested, Agnello v. United States, supra, 269 U.S. at 30 [46 S.Ct. at 5, 70 L.Ed. at 148]; Marron v. United States, 275 U.S. 192, 199 [48 S.Ct. 74, 77, 72 L.Ed. 231, 238] (1927); United States v. Rabinowitz, 339 U.S. 56, 61–62 [70 S.Ct. 430, 433, 94 L.Ed. 653, 657–658] (1950). The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime —things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest. *Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest.* Agnello v. United States, supra, 269 U.S., at 31 [46 S.Ct. at 5, 70 L.Ed. at 148]. Here, we may assume, as the Government urges, that, either because the arrests were valid or because the police had probable cause to think the car stolen, the police had the right to search the car when they first came on the scene.

But this does not decide the question of the reasonableness of a search at a later time and at another place. See Stoner v. California, 376 U.S. 483 [84 S.Ct. 889, 11 L.Ed.2d 856]. The search of the car was not undertaken until petitioner and his companions had been arrested and taken in custody to the police station and the car had been towed to the garage. At this point there was no danger that any of the men arrested could have used any weapons in the car or could have destroyed any evidence of a crime—assuming that there are articles which can be the 'fruits' or 'implements' of the crime of vagrancy. Cf. United States v. Jeffers, 342 U.S. 48, 51–52 [72 S.Ct. 93, 95, 96 L.Ed. 59, 64] (1951). Nor, since the men were under arrest at the police station and the car was in police custody at a garage, was there any danger that the car would be moved out of the locality or jurisdiction. See Carroll v. United States, supra, 267 U.S., at 153 [45 S.Ct. at 285, 69 L.Ed. at 551]." (Emphasis supplied.)

Defendant would apply the reasoning of Preston to his situation. He claims that because he had been taken into custody by the three policemen in Mrs. Larner's living room, they had no right to extend their search further to the particular room he rented; that there was no justification for searching his room without a warrant in order to prevent him from assaulting the officers or to prevent him from destroying evidence of the crime. We do not think that the rule of Preston can be helpful to the defendant in the instant case under these circumstances. Preston proscribes searches and seizures which are not an incident to an arrest and are "remote in time or place". Preston involved the search of an automobile, custody of which the police had taken at the time they arrested Preston. They did not, however, search the automobile at that time but removed it to the police station and subsequently had it towed to a garage.

Thereafter, with Preston safely incarcerated in jail and his automobile towed to and stored in a garage in police custody, the search began. Certainly, as held in Preston, such search and seizure was remote in time and place so that it was not an incident of the arrest, made contemporaneously therewith. Cf. Adams v. United States, 1964, 118 U.S.App.D.C. 364, 336 F.2d 752. Our situation here is entirely different. Defendant's arrest in the first instance was based upon the prior issuance of an arrest warrant and was lawful. Its legality is not challenged. The arrest was made in the living room of the Larner apartment. The defendant had a key to the Larner apartment and had the right to use the living room in order to get to and from the bedroom which he rented. There was no other way in which he could get there. He was, then, arrested in a place which he lawfully had a right to use. His bedroom, with the door open, was readily accessible and contiguous to the place of the arrest through the living room and dining room. We think it not unreasonable to hold that as an incident to the lawful arrest the officers not only had the right to search the defendant's person, but that such right extended to the room wherein he slept which was adjacent to the dining room and living room which he had a right to use and wherein he was arrested. Officers may contemporaneously with a lawful arrest search the premises under the immediate control of the person arrested. United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Agnello v. United States, 1925, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409.

In Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399, the Supreme Court stated at page 150 of 331 U.S., at page 1101 of 67 S.Ct.:

"This Court has also pointed out that it is only unreasonable searches and seizures which come within the constitutional interdict. The test of reasonableness cannot be stated in rigid and absolute terms. 'Each case is to be decided on its own facts and circumstances.' Go-Bart Importing Co. v. United States, 282 U.S. 344, 357 (1931) [51 S.Ct. 153, 158, 75 L.Ed. 374]."

And at page 152 of 331 U.S., at page 1102 of 67 S.Ct.:

"Nor can support be found for the suggestion that the search could not validly extend beyond the room in which petitioner was arrested."

A case from this court, Williams v. United States, 8 Cir., 1958, 260 F.2d 125, 129, 130, certiorari denied, 359 U.S. 918, 79 S.Ct. 596, 3 L.Ed.2d 579, comes close in facts. Therein Williams, who was charged with violation of the Narcotics Act, was arrested in the hallway outside his bedroom located in a dwelling house. His bedroom was immediately off the hallway. The hallway led to a carpeted stairway up to the second floor, where there was located a kitchen and bathroom to which the defendant also had access and the right of use. The search, which was an incident of what this court held to be a lawful arrest, disclosed marijuana in the defendant's room and both marijuana and heroin under the carpeting of the stairway outside his room and leading upstairs to the kitchen and bathroom. The trial court denied a motion to supress narcotics so found and seized. We held that the search of his room, the hall and stairway and kitchen and bathroom upstairs was permissible under the rule of Harris, supra, even though the arrest had been made in the hallway downstairs. Defendant here would distinguish the holding of Williams on the ground that the defendant there gave his consent to the search. The case was not determined on a consent basis (the defendant was under arrest and probably could have claimed coercion) but solely upon whether or not the search following the arrest was reasonable within the purview of the Fourth Amendment. We hold that here, too, the search was an incident to a lawful arrest, was made contemporaneously therewith, was within reasonable limits, and that the lower court committed no error in denying defendant's motion.

Defendant's second contention is:

"The Court erred in admitting the hearsay testimony of Molly Larner concerning a telephone conversation allegedly held with the defendant."

The objected-to testimony of Molly Larner came about in this fashion. Mrs. Larner had testified that when the defendant first rented the room from her he gave her a check for $40, which was for one month's rent; that he brought his clothes with him and stayed in the room Sunday night. She was then asked:

"Q. Now what about Monday?

"A. Monday he went away in the morning. And he called me in the afternoon from downtown, he says that—

"Mr. Edgar: Your Honor, I believe I am going to object to that, giving any conversation Miss Larner might have had with the defendant; unless it would be in the nature of an admission, I think it would be hearsay.

"Q. (By Mr. Schmidt) You talked to someone that you thought was Mr. Haas in the afternoon on Monday is that correct?

"A. Yes. He called me up and he told me—

"Q. Mrs. Larner, did he return on that Monday evening?

"A. No.

"Q. To your apartment?

"A. No.

"Q. On the following day, the Tuesday, did he return to your apartment?

"A. Yes. Tuesday he came in.

"Q. Did you have any conversation with him Tuesday?

"A. Not much, no.

"Q. Did he remain in the apartment Tuesday evening?

"A. Yes.

"Q. Did he leave again on Wednesday?

"A. Yes.

"Q. Approximately what time of day did he leave on Wednesday?

"A. Well, I really can't recall the exact time in the morning.

"Q. Do you recall whether or not you talked to him on that particular day?

"A. Not much, no.

"Q. Did you ever have any conversation with Mr. Haas concerning a job, concerning jobs?

"A. No.

"Q. Did Mr. Haas ever tell you whether or not he was employed?"

[There was objection and then discussion off the record.]

"Q. (By Mr. Schmidt) Did Mr. Haas ever make a statement as to whether or not he was employed or looking for a job?

"A. I didn't recall that conversation with him.

"Q. Now do you recall at any time, or did you have any conversation with Mr. Haas concerning the check that he gave you for the room rent?

"A. When he called me Monday afternoon he said sorry, he lost his job, can he pay me by the week. And I says well, I'm sorry, the check went to the bank Monday, I sent it to the bank and if the check will bounce I will refund him back some of the money.

"Q. He told you Monday morning he had lost—

"A. No. He called me from downtown.

"Q. I see. Now, you told him that—

"Mr. Edgar: Your Honor, I think you have already sustained an objec-

tion as to a certain phone call and the witness's testifying to a conversation relative to the job took place on the phone. I believe this would come within your ruling, your prior ruling as to this, as hearsay.

"Mr. Schmidt: Your Honor, that statement was—it was a response to a direct question of mine. I would request that I be permitted to tie up the conversation with the statements of the defendant prior to renting the room in fact that she recognized—

"The Court: If she can recognize and identify his voice and if she knows it was he who was talking to her then she may tell about the telephone conversation, otherwise she can't. You may proceed.

"Q. (By Mr. Schmidt) Now the telephone conversation which you had on Monday, did you recognize the voice of Mr. Haas on the telephone that particular day.

"A. He mentioned his name, yes.

"Q. Was the conversation that you had with Mr. Haas relative to—

"Mr. Edgar: Your Honor, I—

"The Court: I will sustain the objection to the leading form of the question. Now let her do the testifying.

"Q. (By Mr. Schmidt) Mrs. Larner, was any of the conversation pertaining to statements that you had already talked to Mr. Haas by the telephone? In other words, were any of the telephone statements related to your previous conversation with Mr. Haas concerning the renting of the room?

"A. We didn't have enough in common to talk about. He told me if he can pay me by the week and I told him I am sorry the check went to the bank Monday.

"Q. This telephone conversation that you had, did you relate to the particular check that you had received from Mr. Haas on Sunday?

"A. There was nothing common about that. He wanted to know if he could pay by the week. That means if I still have the check maybe he can come and give me another check by the week and I told him the check had gone to the bank.

"Mr. Schmidt: Your Honor, I request that this evidence and testimony be permitted in view of Mrs. Larner's statement that she recognized his voice.

"The Court: Proceed. There has been no objection to it.

"Mr. Edgar: Your Honor, I don't believe she has ever testified she recognized his voice. I believe that was supplied by Mr. Schmidt.

"The Court: Did you or did you not recognize his voice?

"The Witness: Well, I don't know because I haven't met too much the man if his voice. He just called me up and told me Mrs. Larner, I have bad news, I have lost my job. If I can pay you by the week. That means I shouldn't send the check to the bank, but the check went to the bank Monday morning.

"The Court: Let me ask you this: Did you have any conversation with anybody else other than the defendant here about rent?

"The Witness: No.

"The Court: About his rent.

"The Witness: No.

"The Court: Would anybody else be in a position to know about what happened?

"The Witness: No. I am all by myself in that apartment and I don't make any discussion with anybody else what I do.

"The Court: All right. Proceed.

"Q. (By Mr. Schmidt) Mrs. Larner, Mr. Haas told you that he was unemployed, or that he had lost his job.

"A. Yes. Yes.

"Q. Did he make any other statements to you other than the fact that he wanted to pay by the week?

"A. No.

"Q. Now can you tell us whether or not this check cleared through the bank?

"A. Oh, it took a long time. I got it back; his account was closed."

■ The introduction of defendant's statements to Mrs. Larner over the telephone tended to show that prior to the robbery the defendant had no job and little, if any, money. Immediately after the robbery he was in possession of funds having made a substantial deposit in his checking account. This was all necessary foundation testimony. While it is the contention of the defendant now that there was a failure on the part of Mrs. Larner to identify him as the person with whom she talked, a reading of the transcript supra is most convincing that the court ruled correctly in holding the telephone conversation to be admissible. Clearly, all the way through her examination she indicates that she knew she was talking with the defendant. When asked at the end if she recognized his voice, there was some hesitation in her reply but none at all in her belief that she was talking with the defendant and that no one else could have had the information he had in talking with her. Subsequent testimony supports the conclusion. Mrs. Larner was still testifying and was asked:

"Q. Now after leaving the apartment on Wednesday, when did he next return to the apartment?

"A. Thursday.

"Q. What time Thursday?

"A. Oh, it could be around 9:00 or 10.00 o'clock.

"Q. What did he do Thursday when he came in?

"A. He came home and changed his clothes, then he told me he got a prospect for a nice job. I was glad to hear that and he walked away. That is as far as I seen him."

We hold that the testimony of the telephone conversations was clearly admissible.

Defendant's third claim of error is as follows:

"The Court erred in admitting testimony concerning the financial condition of the defendant subsequent to the robbery as no proper foundation was laid for such testimony."

Through Mrs. Eleanor Reasoner, a bank teller employed at the North County Bank, the government was able to establish that on September 2, 1964, the day of the alleged robbery, the defendant made a deposit of $800 in currency in his account at that bank, the currency being in 20's, 10's, 5's and 1's (as had been the currency taken in the robbery). The defendant concedes that such testimony would become relevant had there been a competent showing that the defendant was without funds prior to the robbery, such as indicated by this court in Neal v. United States, 8 Cir., 1939, 102 F.2d 643, 648, certiorari denied, 312 U.S. 679, 61 S.Ct. 448, 85 L.Ed. 1118:

"In short the evidence of possession of a large sum of money by the defendant immediately after a theft raises a presumption of fact that the money found is a part of the stolen money and that the defendant was connected with the theft. Under this general rule the foundation for the introduction of such evidence includes proof of (1) the 'impecuniosity' of the defendant just before the theft, (2) and the 'sudden accession' of wealth (3) contemporaneous with the theft."

See, also, Gill v. United States, 5 Cir., 1961, 285 F.2d 711, 713, certiorari denied, 373 U.S. 944, 83 S.Ct. 1554, 10 L. Ed.2d 699, and Self v. United States, 5 Cir., 1957, 249 F.2d 32, 35.

■ Having held that the evidence with reference to the defendant's shortage of funds, the giving of an n. s. f. check, etc., immediately prior to the robbery as admissible, we find it a proper foundation for the evidence with reference to the deposit of a large sum of money in his account immediately after the robbery. No error was committed as to point No. 3.

Defendant's fourth point is as follows:

"The Court erred in denying appellant's motion to dismiss the information on the grounds that the censorship of mail between appellant and his counsel amounted to a denial of the assistance of counsel within the meaning of the Sixth Amendment to the Constitution."

After a jury had been empaneled and prior to the government's opening statement, counsel for the defendant called attention of the court to the fact that the defendant had been confined in the City Jail without bond. He stated:

"Mr. Edgar: He was confined, and the bond was set, but he wasn't able to raise bond, and since September 4th, he has been confined and has been and still is a prisoner. I have written several letters to him, and he has written several letters to me, and all of those letters were censored, appearing on the face of the letters was a censor stamp. And it is our position that the censorship of these letters amounts to a denial of the assistance of counsel within the meaning of the Sixth Amendment, in that we were not able to freely at all times converse in private with the client. For this reason, we would urge the Court to dismiss the information filed in this case.

"The Court: May I ask whether or not you were ever denied the right to see the prisoner at any time?

"Mr. Edgar: During the ordinary visiting hours.

"The Court: What?

"Mr. Edgar: At any time I went during the ordinary visiting hours.

"The Court: You had the opportunity to see and talk in private with him?

"Mr. Edgar: Yes, in that there is a lobby there.

"The Court: What?

"Mr. Edgar: There is a lobby there, and a guard was present in the room, but to my knowledge there was never any attempt made to overhear any conversation.

"The Court: The motion will be denied.

"Mr. Schmidt: May I make a statement for the record?

"The Court: Yes.

"Mr. Schmidt: The statement made by counsel concerning the censorship of letters—I would advise the Court that the United States certainly has not received any information from anyone or any letter that was sent to the City Jail.

"I understand they open their letters, but that is for safety reasons, so that it might be determined whether or not there is any instrument in the letter that can be used either for a jail break or possibly suicide.

"The Court: You may proceed with your opening statement."

There is first cited and relied on by the defendant in connection with this point the case of Coplon v. United States, 1950, 89 U.S.App.D.C. 103, 191 F.2d 749, certiorari denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690. That case stands for the proposition that if government agents intercepted telephone conversations between the accused and her counsel both before and during her trial in the District Court, her constitutional rights were violated. Therein the court said at page 757 of 191 F.2d:

"If this [interception of telephone conversations between the defendant and her counsel] occurred, it was a violation of the appellant's constitu-

tional rights. The Fifth Amendment enjoins that no person be deprived of life, liberty or property without due process of law. Such due process includes the right of one accused of crime to have the effective and substantial aid of counsel. Neufield v. United States, 1941, 73 App. D.C. 174, 182, 118 F.2d 375, 383. Moreover, the Sixth Amendment provides that 'In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence.'

"It is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him."

Holding that while there was sufficient evidence in the record to justify Judith Coplon's conviction, that she was nevertheless entitled to a hearing on her charge that the government listened through wire-tapping devices to her telephone conversations with her attorney before trial and while it was going on, the court stated at page 760:

"* * * The order denying the motion for a new trial will be set aside, as far as that ground is concerned, and the case will be remanded for a hearing to determine whether the alleged interceptions actually occurred. If so, the District Court should award a new trial at which the accused can be free of surreptitious interception of her telephone conversations with her counsel, and can enjoy the right of his effective assistance which is guaranteed by the Constitution."

That is not the situation with which we are here concerned. There has been no surreptitious interception by government agents of communications between the defendant and his counsel. There has been no wire-tapping or other improper listening. All that has occurred apparently is that the St. Louis City Jail inmates have had their mail censored for safety purposes. This is a safety measure indulged in by the administrators of both state and federal prisons throughout the entire country. It does not mean in the instant case that the defendant has been deprived of the effective assistance of counsel within the meaning of the Sixth Amendment to the Constitution of the United States. The wise judge who was presiding when the motion was made took the matter into his own hands and inquired if counsel were ever denied the right to see the prisoner at any time, receiving the information that counsel did have an opportunity to visit and consult privately with the defendant during the ordinary visiting hours and that to his knowledge "there was never any attempt made to overhear any conversation".

Defendant also cites and relies on United States v. Lebron, 2 Cir., 1955, 222 F.2d 531, 534, certiorari denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774, where the late Judge Frank said:

"The appellants assert an abridgment of their right to counsel because of the attendance by Raymond Sorrell, a government informer, at a conference between Conrad J. Lynn, an attorney, and several party members. The grand jury had already handed down the indictment against the seventeen, and Mr. Lynn had been retained to represent at least one defendant. Sorrell had not yet been exposed as an informer, and party members presumably regarded him as a loyal party member.

"It may be that where, after indictment, a government agent or government informer intrudes on any discussion whatever between a defendant and his lawyer, the intrusion is such a violation of defendant's constitutional right to counsel that the defendant is entitled to a new trial without any proof by him that the intrusion harmed defendant, even if the intrusion was prompted by the highest motives. Caldwell v. United States, 92 U.S. App.D.C. 355, 205 F.2d 879; Coplon v. United States, 89 U.S.App.D. C. 103, 191 F.2d 749; Cf. United States v. Venuto, 3 Cir., 182 F.2d

519; Melanson v. O'Brien, 1 Cir., 191 F.2d 963. Where the intrusion is on a conference between defendant's lawyer and prospective witnesses, with the defendant absent, the result may well be the same—provided there is proof that the conference involved a discussion of the prospective witness' testimony at the trial.

"But here such proof is lacking. Sorrell, the informer, testified that he attended a meeting of the New York Junta or Board of the Party on June 14, 1954, at which Mr. Lynn was present. But Sorrell had no recollection that at that meeting anything was said concerning the defense of the defendants."

Conviction of the defendants there was affirmed.

United States ex rel. Cooper v. Denno, 2 Cir., 1955, 221 F.2d 626, certiorari denied, 349 U.S. 968, 75 S.Ct. 906, 99 L.Ed. 1289, preceded the Lebron decision by a few months. Judge Frank there also agreed, though by separately concurring opinion. The court in Denno said, at page 629 of 221 F.2d:

"As above stated, the petitioners appear to rely upon the claim that their rights were violated by an intentional, subtle intrusion upon the lawyer-client relationship. [The planting of a police officer in a spectator's seat near the table of defendant's attorneys so as to overhear private privileged communications between them and their attorneys.] The argument is made, however, that even if Rubin's presence was justified for security purposes, his encroachment was unlawful because he was in a position to hear confidential lawyer-client communications. This argument is tantamount to the assumption that the right of privacy of lawyer-client communications overrides reasonable security measures. We do not agree. 'The people of the State are also entitled to due process of law'. Stein v. People of State of N. Y., 346 U.S. 156, at page 197, 73 S.Ct. 1077, at page 1099, 97 L.Ed. 1522. Such rights are not necessarily mutually exclusive. Each must yield to the rule of reason. In case of actual or possible conflict, the rule is to be applied by the court in the light of the existing circumstances."

While Judge Frank, in his separately concurring opinion, stated that he desired to "dissociate [himself] from what I think my colleagues' unnecessarily sweeping statement that 'reasonable security measures' can, in some circumstances, justify intrusion on 'the right of privacy of lawyer-client communications' ", we nevertheless find the case and his separately concurring opinion of no supportive assistance to defendant herein.

The case of Green v. State of Maine, D.C.Me., 1953, 113 F.Supp. 253, involved facts very similar to those with which we are here concerned. The opinion there was written by Circuit Judge Woodbury of the Court of Appeals for the First Circuit, apparently then sitting on the District Court by assignment. At page 256 of his opinion he stated:

"Furthermore, Green says that while he was being held in jail awaiting indictment (he did not post bail), mail to and from his attorney was opened without his authority, and when he complained he 'was locked-up and held incommunicado, in violation of his rights to counsel and due process of law.' The opening and inspection of mail passing back and forth between prisoners and those at liberty is an ordinary, usual and obviously essential incident to the safe custody of prisoners. The practice violates no constitutional right of which I am aware."

The Fifth Circuit, in Adams v. Ellis, 5 Cir., 1952, 197 F.2d 483, at page 485, in an action brought for deprivation of rights through mail censorship, stated:

" * * * It is well recognized that prison authorities have the right of censorship of prisoners' mail.[1] As

said in Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L. Ed. 1356, 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' As this Court has said, it is not the function of the Courts to superintend the treatment and discipline of prisoners in penitentiaries, but only to deliver from imprisonment those who are illegally confined. Sarshik v. Sanford, 5 Cir., 142 F.2d 676; Platek v. Aderhold, 5 Cir., 73 F.2d 173. This is, of course, not to say that a case could not arise where punishment or treatment could be deprivation of the prisoner's rights." ("[1] Numer v. Miller, 9 Cir., 165 F.2d 986; Reilly v. Hiatt, D.C., 63 F.Supp. 477; Gerrish v. State of Maine, D.C., 89 F.Supp. 244.")

Certainly that is not true in the instant case, where defendant and his counsel had every opportunity needed for personal consultation at the jail prior to trial. See, also, Gerrish v. State of Maine, D.C. Me., 1950, 89 F.Supp. 244; United States ex rel. Vraniak v. Randolph, D.C.E.D. Ill., 1958, 161 F.Supp. 553, 559, aff'd 7 Cir., 261 F.2d 234, certiorari denied, 359 U.S. 949, 79 S.Ct. 733, 3 L.Ed.2d 681; In re Smigelski's Petition, D.C.N.J., 1960, 185 F.Supp. 283, 286.

 It well may be that a case of mail censorship could result in deprivation of the effective assistance of counsel in derogation of the Sixth Amendment. If, for example, the use of the mails constituted the only method whereby the defendant and his counsel could communicate with each other and such means of communication was censored, certainly the defendant then would have been deprived of his constitutional rights. We do not view the instant situation as comparable. Here defendant and his counsel were given every opportunity needed to communicate privately with each other during the ordinary visiting hours at the St. Louis City Jail. The opening by the City Jail officials of mail between defendant and his counsel, done for security purposes, and the contents thereof not communicated to the prosecution, presents an entirely different situation.

A review of this record convinces us that the evidence of defendant's guilt was substantial and that no reversible errors were committed by the trial court.

During the trial in District Court and on appeal to this court the defendant had the services of a court-appointed attorney and two associate attorneys acting in his behalf with leave of court. To J. Roger Edgar, James W. Singer, III, and Ramon J. Morganstern this court is indebted for their able representation of the defendant and the protection of his rights. The representation has been in the very highest traditions of the bar. We express our appreciation.

Affirmed.