William C. DRUMMOND, Appellant,

v.

UNITED STATES of America,
Appellee.

Alphonse Vincent CASTALDI, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 17875, 17885.

United States Court of Appeals
Eighth Circuit.

Sept. 29, 1965.

Harry Gershenson, Jr., St. Louis, Mo. (court-appointed), for appellants.

Robert J. Koster, Asst. U. S. Atty., St. Louis, Mo., for appellee.

Before VAN OOSTERHOUT, BLACKMUN, and MEHAFFY, Circuit Judges.

BLACKMUN, Circuit Judge.

We are confronted here primarily with search and seizure issues.

A 3-count indictment returned against William C. Drummond and Alphonse Vincent Castaldi charged both of them, in its first count, with a violation in May 1964 of 18 U.S.C. §§ 471 and 2 (counterfeiting a $20 federal reserve note); charged Drummond alone, in its second count, with a violation of 18 U.S.C. § 474 (making a plate in the likeness of the note); and charged both, in the third count, with a violation of 18 U.S.C. § 371 (conspiracy, together with J. P. Long, Jr., to commit a counterfeit offense).

The defendants entered pleas of not guilty. They were tried together. The jury found Drummond guilty as charged in all three counts. It found Castaldi guilty only of the conspiracy charge in the third count and acquitted him of the substantive charge in the first count. Judge Meredith gave Drummond concurrent sentences of ten years on the first two counts and of five years on the third count. He gave Castaldi a sentence of five years on the conspiracy count. The defendants appeal separately in forma pauperis.

Each defendant was represented at the trial by his own court-appointed attorney. Trial counsel were given leave by the district court to withdraw after notice

of appeal had been filed. Both Drummond and Castaldi are represented here by one attorney appointed by this court.

The issues before us concern (a) the standing of the two defendants to assert that searches of Long's automobile and of his home and garage were unreasonable and thus violative of the Fourth Amendment; (b) the admission of evidence seized at these searches; (c) the trial court's failure to instruct the jury about a prior conviction of Castaldi; and (d) the court's rejection of Castaldi's suggestion for rehabilitation testimony.

Long was the prosecution's principal witness. He had been charged separately in connection with the counterfeiting and had pleaded guilty. He was brought back from the penitentiary to appear. He testified as follows:

In 1964 he owned and operated some taxicabs in Saint Louis County, Missouri. Drummond was working for him as a parttime driver. On March 1 Castaldi asked Long for work but Long did not employ him. He again encountered Castaldi in a restaurant in mid-March. During this conversation Long expressed concern about his being unable to use the garage at the rear of his residence at 6928 Plymouth, University City, because he could not get his Thunderbird convertible into it. About a week later, during still another conversation between the two men, Castaldi asked Long whether he might rent the garage. Long proposed, as he recalled, a rental of $15 a month. Castaldi paid him "for three months". This arrangement was oral. Nothing was said as to Castaldi's anticipated use of the garage.

In mid-April Long had occasion to burn trash in his incinerator which stood next to the garage. He noticed on the side door a padlock which had not been there before. He looked in the window. He was able to see "some machinery of some kind that was partially covered". He met Castaldi that night and asked him what he had in the garage. Castaldi told him that it was a borrowed press with which he intended to print pornographic material. Long did not protest.

At this time he gave Castaldi a key to the house because the switch for the garage was in the kitchen and electricity was needed to operate the press.

One night in early May Long returned home earlier than usual and found Drummond and a Negro called Jess photographing a $20 bill in his bedroom. Long then realized what was going on and "was a little unhappy about it". Drummond talked with him about taking part in the operation. Long at first assented, then hesitated, and, at a later meeting with both defendants, agreed to participate and to acquire a better camera for them. Castaldi told him that he would be repaid for the camera's cost and would receive $5,000 in good money and $3,000 in counterfeit. Long rented a camera on Monday, May 18.

The next evening Drummond and Jess used the new camera to photograph the bill and performed other steps in the preparation of plates for its counterfeiting. Castaldi was present in the house during that week. Drummond did the printing. Long and Drummond covered the windows and door of the garage with masonite. On Thursday and Friday Long mowed the lawn in order to drown the noise of the press. On Friday printed notes were taken into the house, sorted and trimmed. Castaldi assisted in the trimming. Long took his $3,000 worth and left. He gave these bills to William Mackey to take out of town to pass. Long did not return to his house that night.

He did return Saturday morning. He found a stack of bills still there. On Sunday, May 24, he received a call from Mackey. Long trimmed 26 of the bills and put them in his pocket. He placed others, untrimmed, in the trunk of his automobile and went to meet Mackey at a Saint Louis restaurant.

Testimony from the arresting agents and from Long produced the following: Unknown to Long, Mackey had been arrested on Saturday in Springfield, Illinois, first by the local police when he attempted to pass some of the counterfeit notes, and then by a secret service

officer. Mackey named Long as his source of supply. Mackey also informed the arresting agent that Long's Thunderbird, which he described, had been used to bring the counterfeit notes to him the day before in Saint Louis.

When Long met Mackey on Sunday at the Saint Louis restaurant secret service agents were present. They had arranged with Mackey that he should signal them if Long had counterfeit in his possession. The signal was given. The agents placed Long under arrest in the restaurant, searched his person, and found the 26 counterfeit $20 bills. These were seized. Long's automobile was outside on the restaurant's parking lot. It was seized. The search of its trunk produced 687 untrimmed counterfeit bills.

Upon his arrest Long gave the agents a key to his home. The agents, with Long, went to the house. This was within a half hour of the arrest. They entered the house and there found and seized the camera and other items used in the counterfeiting process. They then went to the garage. Long had a key for its padlock. He produced it and opened the lock and they entered. That search led to the printing press, inks, chemicals, and partial reproductions of $20 notes scattered about the floor.

No warrant had been issued to search either the automobile, the house or the garage.

Witnesses testified as to having seen Drummond and Castaldi around Long's premises preceding the arrest of Long and the seizures there. There was fingerprint identification of Drummond upon materials used in the counterfeiting operation but none of Castaldi.

Outside the presence of the jury Long testified, under questioning by the defense, that he had not rented any part of the house to Castaldi; that the arresting agents did not show him any arrest warrant but only said they had one; that he was not shown a warrant for the search of the car; and that "I was asked at that time if I would sign—I believe they called it a waiver—and I did sign something, I don't know what". Upon inquiry by the court he said that he did not recall whether the agents asked his permission to search his automobile; that he did sign a waiver permitting the search of his house; that this was "in the back seat of their car there on the parking lot. They told me I could make it hard on them and make them wait until Monday when they could normally get a warrant or I could sign the waiver"; and that they searched the car before they went to the house.

The paper which Long signed and which was designated at the trial as Court's Exhibit 1, reads:

"St. Louis Mo.
2-24-64
1.30 pm

"My name is J. P. Long and I live at 6928 Plymouth, University City, St. Louis County, Missouri.

"I have been arrested for counterfeiting by the Secret Service. I know that they must have a search warrant to search my residence at 6928 Plymouth unless I waive that need and invite them to so search for counterfeits and equipment.

"I invite the Secret Service to search my residence at 6928 Plymouth, and I waive the need for a search warrant. This is entirely voluntary on my part.

"Witnesses

Geo Stigall
Fred H. Backstrom
Winston J. Gentz                    /s/ J. P. Long, Jr."

The three witnesses were secret service agents.

Such was the government's case-in-chief. The only witnesses for the defense were the defendants themselves. Castaldi took the stand first. He testified that on the day before Long was arrested Long told him that he was leaving town and asked him to come to the house to drive a cab for him; that he went there but found no one home; that the next morning a cab driver told him Long had been arrested; that this was his first knowledge of Long's implication in criminal activity; that he, the witness, did not take part in any counterfeiting or conspiracy; that he did not rent the garage; that he knew Drummond as a relief driver; and that he made no plates or pictures of a bill.

Drummond testified that he had pleaded guilty to charges of three prior felonies; that he had had training and experience in lithography; that he drove a cab for Long; that Long asked that he teach him how to operate a printing press; that Long told him he was going into business and a press was coming; that he rented a truck for Long to get the press; that he bought printing supplies and rented a camera; that he understood Long wanted to print letterheads; that he showed Long how the press worked; that he did not know a man by the name of Jess; that he had boarded up the garage where glass had been broken; that he heard of Long's arrest at one of the cab stands; that he left Saint Louis in June and went to Las Vegas; that there he learned from his mother that authorities were looking for him; that he called the local sheriff and told him where he was; that four days later he was arrested and returned to Saint Louis; and that he regarded the counterfeit bills as poor work.

In rebuttal a Saint Louis man for whom Drummond worked in early 1964 testified that Drummond told him he knew a Negro photographer named Jess who would be able to take pictures of the kind the employer wanted.

A. The searches and seizures. Long's arrest, the search of his person at the time of his arrest, the seizure of the counterfeit bills then in his pockets, and the bills' admission in evidence are *not* challenged here. The defense attack, instead, is upon the warrantless searches of Long's automobile (which produced additional counterfeit bills), his house and his garage, upon the seizure of the items discovered in the three searches, and upon the admission of those items in evidence. In its turn the government strongly questions Drummond's and Castaldi's standing, under Fed.R.Crim.P. 41(e), to raise the constitutional issue of unreasonableness of the searches and seizures.

We conclude that we need not decide the issue of standing or discuss the implications of Jones v. United States, 362 U.S. 257, 260–267, 80 S.Ct. 725, 4 L.Ed. 2d 697 (1960), as applied to the facts of this case. We do so because we feel that, in any event, each of the three searches and consequent seizures met the Fourth Amendment test of reasonableness. We consider the searches in the order in which they occurred:

1. Long's automobile. Long's arrest in the Saint Louis restaurant was pursuant to an outstanding warrant. That arrest and the search of his person were lawful, United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 94 L.Ed. 653 (1950), and, as we have noted, are so conceded by the defense. His automobile, although naturally not inside the restaurant with him at the time of the arrest, was parked immediately outside on the restaurant's lot. Mackey had described the Thunderbird to the secret service agents and had told them the day before that Long had used it to bring counterfeit bills to him. The car met the description. If the car was searched forthwith, as Long's testimony indicated, the search would appear to have been incident to a lawful arrest and, therefore, a reasonable one. See Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct.

4, 70 L.Ed. 145 (1925); Stoner v. State of California, 376 U.S. 483, 486, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); Haas v. United States, 344 F.2d 56, 59–60 (8 Cir. 1965); Feguer v. United States, 302 F. 2d 214, 248 (8 Cir. 1962), cert. denied 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110.

■ An agent, however, testified that they seized the car and had it removed to the Saint Louis Federal Building and searched there. The seizure was made under the authority of 49 U.S.C. §§ 781–783. These statutes declare the transportation of any contraband article in a vehicle to be unlawful, define "contraband article" to include a counterfeit obligation of the United States and, with exceptions not pertinent here, call for the seizure and forfeiture of any vehicle which has been used in carrying contraband. Mackey's attempt to pass counterfeit bills in Springfield the preceding day, his federal arrest, his statements to the arresting agents that Long was the source of his counterfeit supply, his description of Long's automobile and of its use for delivering counterfeit, Long's arrest in Saint Louis with counterfeit on his person, and the presence of the described Thunderbird on the restaurant's lot provided the agents with probable cause (despite the fact that some of this foundation material was hearsay, see Jones v. United States, supra, p. 269 of 362 U.S., 80 S.Ct. 725; Draper v. United States, 358 U.S. 307, 311–312, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)) to conclude that this automobile had been used to transport counterfeit bills of the United States, and provided the basis and, indeed, the duty for the agents to exercise their seizure authority under the statutes. If the agent's version is to be accepted, the car's search following the seizure, when it had remained in continuous and proper government custody, was not an unreasonable one within the prohibition of the Fourth Amendment. Sirimarco v. United States, 315

F.2d 699, 701 (10 Cir. 1963), cert. denied 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1032 (a weaker case, factually, than the present one); Burge v. United States, 342 F.2d 408, 414 (9 Cir. 1965), cert. denied, 86 S.Ct. 63 (where the dissenting judge as is disclosed by the court's first opinion, Burge v. United States, 333 F. 2d 210, 219 (9 Cir. 1964), did not disagree on this issue). See Ted's Motors, Inc. v. United States, 217 F.2d 777, 780 (8 Cir. 1954). Because of the presence of the seizure statutes and the agents' action pursuant thereto, the case is factually distinguishable from Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964).

The counterfeit bills found in the automobile, although no more than cumulative material anyway, were properly admitted in evidence against Drummond and Castaldi.

■ 2. Long's home. The protection afforded by the Fourth Amendment with respect to a search of one's house may, of course, be waived by a consent freely and intelligently given. Whether such consent exists is usually a question which is "simply one of fact for the trier's determination". Burge v. United States, 332 F.2d 171, 173 (8 Cir. 1964), cert. denied 379 U.S. 883, 85 S.Ct. 155, 13 L.Ed.2d 89. If the finding is in the affirmative and is supported by substantial evidence, it is not our privilege on appeal to revise it. Maxwell v. Stephens, 348 F.2d 325, 336 (8 Cir. 1965); Burge v. United States, supra, p. 173 of 332 F. 2d; Burnside v. Nebraska, 346 F.2d 88, 90 (8 Cir. 1965).

■ The defense suggests that Long's execution of the written consent was involuntary in that it was signed in the back seat of the car at the time of his arrest, in that it was prepared by the arresting agents, and in that Long did not know what he was signing. See Weed v. United States, 340 F.2d 827, 829 (10 Cir. 1965). Judge Meredith's implicit finding, however, that Long did consent and that his consent was freely and intelligently given finds adequate

support in this record. There were no drawn guns as in the Weed case. Long not only consented orally but executed the written waiver. He conceded, upon questioning by the court, that he was aware that what he signed was a waiver permitting the search. He was present when his house was entered. It was he who unlocked the door with his own key. He was and has been cooperative with the agents. And at no time has he claimed that his consent was not voluntary. See Roberts v. United States, 332 F.2d 892, 897 (8 Cir. 1964), cert. denied 380 U.S. 980, 85 S.Ct. 1344, 14 L.Ed.2d 274.

■ If it be suggested that, because Long had given Castaldi a key to the house and Drummond and Castaldi were present in the house during some of the counterfeit operations, a joint possession and rights in the premises emerged, Long's consent still was sufficient to validate the search. One having equal authority over premises may authorize a search of them. We have so held in Roberts v. United States, supra, pp. 896–897 of 332 F.2d, and in Maxwell v. Stephens, supra, pp. 336–337 of 348 F.2d See Burge v. United States, supra, p. 413 of 342 F.2d; Teasley v. United States, 292 F.2d 460, 464 (9 Cir. 1961); United States v. Sferas, 210 F.2d 69, 74 (7 Cir. 1954), cert. denied 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086.

Items seized at the Long house were therefore properly admitted in evidence against Drummond and Castaldi.

■ 3. Long's garage. If no landlord-tenant relationship existed between Long and Castaldi with respect to the garage, we would readily conclude that the entry and search of the garage, as that of the house, was with Long's oral consent and that Judge Meredith's finding that this consent was voluntary is also adequately supported by the record. Long was the owner. A consent by him made the search a reasonable one. There are even "garage" and outbuilding cases to this effect. Von Eichelberger v. United States, 252 F.2d 184, 186 (9 Cir.

1958); Cutting v. United States, 169 F.2d 951, 952 (9 Cir. 1948). Further, despite the fact that Court's Exhibit 1 referred only to "my residence" and made no specific mention of the garage, we would conclude that this written consent had application to the garage as well as to the house itself. It was an ordinary type of garage outbuilding in a small back yard. If it is subject to Fourth Amendment protection as part of the "house" or curtilage, United States v. Mullin, 329 F.2d 295, 298 (4 Cir. 1964); Temperani v. United States, 299 F. 365, 367 (9 Cir. 1924); see Care v. United States, 231 F.2d 22, 25 (10 Cir. 1956), cert. denied 351 U.S. 932, 76 S.Ct. 788, 100 L.Ed. 1461, and Taylor v. United States, 286 U.S. 1, 5–6, 52 S.Ct. 466, 76 L.Ed. 951 (1932); compare Carney v. United States, 163 F.2d 784, 786 (9 Cir. 1947), cert. denied 332 U.S. 824, 68 S.Ct. 165, 92 L.Ed. 400, it should be equally subject to the effect of a consent to entry and search of one's "residence".

■ But Long testified—and he was a government witness—that Castaldi approached him about renting his garage; that he acquiesced and specified a monthly rental; and that Castaldi paid him an amount sufficient for three months. This suggests the existence of a lease at the time the garage was entered and searched. It appears now to be well settled that, in the absence of abandonment, a landlord's or hotel's consent to search leased premises is not effective as against the tenant or guest. Stoner v. State of California, supra, 376 U.S. 483, 487–490, 84 S.Ct. 889, 11 L.Ed. 2d 856 (1964); Chapman v. United States, 365 U.S. 610, 616–617, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); United States v. Jeffers, 342 U.S. 48, 51–52, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Lustig v. United States, 338 U.S. 74, 76, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949). See Abel v. United States, 362 U.S. 217, 240–241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), and Jones v. United States, supra, pp. 260–267 of 362 U.S., pp. 730–734 of 80 S.Ct.

As we see it, however, the situation here is not so simply to be analyzed. Whatever may have been contemplated and effected by Long and Castaldi in late March when money apparently passed from one to the other, that factual situation was colored and changed by subsequent events. By May Long had become a participant in the counterfeiting venture. He helped to board up the garage. He mowed. He was present and assisted in the operations in the house. He gave Castaldi a key to his home and he himself acquired a key to the padlock on the garage door. Along with Drummond he was in and out of the garage. Castaldi thus no longer enjoyed any exclusive occupancy. It is too much to expect us to hold on these facts that a lease gave rise to rights in Castaldi as a tenant to protest Long's consent to the search of the garage. Such a holding is rendered even less tenable, so far as Castaldi is concerned, because of his emphatic denial that he rented the garage at all. Although the facts this time are in the reverse, the Supreme Court's refusal to be governed by the "subtle distinctions" of property law, Jones v. United States, supra, p. 266 of 362 U.S., p. 733 of 80 S.Ct. seems applicable here. The situation certainly is to be viewed realistically and, when so viewed, it discloses, at the time of the garage's search, not a leasehold arrangement but a joint enterprise in which Long was a participant. His consent, therefore, makes applicable to the garage the equal authority cases which have been cited above.

Items seized in the garage were thus properly admitted in evidence against Drummond and Castaldi.

B. Castaldi's prior convictions. On direct examination Castaldi testified that in 1960 he had pleaded guilty to a Missouri charge of receiving stolen property. On cross-examination he was asked whether he had been convicted since that time. He answered in the negative. He was then asked, "Have you been convicted * * * in Washington County, in Potosi, Missouri?" Before he answered, counsel, on a defense request, conferred at the bench, out of the jury's hearing. The record is silent as to what occurred at that conference. Thereafter nothing more was said by anyone about the Washington County matter and the cross-examination of the witness proceeded on another subject. The question was never formally withdrawn but there was no motion for a mistrial and no request by the defense that the jury be appropriately instructed.

We now understand that Castaldi in fact was convicted in the Circuit Court of Washington County, Missouri, of tampering with a motor vehicle, but that the Supreme Court of Missouri reversed this conviction on February 8, 1965, and ordered the defendant discharged. State v. Castaldi, 386 S.W.2d 392 (Mo.Sup. 1965). This reversal took place after the federal conviction here.

Castaldi now asserts that the trial court's failure to instruct the jury not to consider the Washington County conviction, as reflecting on his credibility or as indicating guilt, was error.

The question of the propriety of permitting cross-examination of a testifying defendant with respect to a conviction pending on appeal has been before this court recently. In Newman v. United States, 331 F.2d 968, 972–973 (8 Cir. 1964), cert. denied 379 U.S. 975, 85 S.Ct. 672, 13 L.Ed.2d 566, we noted the existence of a conflict on the issue among the federal circuits and of a majority rule in the state courts approving the admission of evidence of a conviction pending appeal. We concluded, however, that the distinctive facts of that case disclosed no prejudice and made it unnecessary for us to decide the question generally. A like conclusion was reached on the facts in Edwards v. United States, 333 F.2d 588, 591–592 (8 Cir. 1964).

Schwab v. United States, 327 F.2d 11, 16–17 (8 Cir. 1964), concerned an analogous situation. There the defendant, on cross-examination, conceded four prior felony convictions. The prosecution

asked about two others. The defendant denied these. The government did not follow through with proof of those two. We concluded that, although a credibility attack of this kind must rest upon conviction, rather than upon mere arrest, accusation or innuendo, the standard was one of essential unfairness and that, under the circumstances of that case too, no improper prejudice could possibly have resulted.

◼ Similarly, we find no prejudicial error here. It would have been better had the question not been asked. But, although asked, it was not answered and no further comment about the conviction was made by anyone before the jury. Castaldi had conceded another state conviction in a recent year. The defense took no positive corrective step whatsoever. Both counsel and the court appear to have been undisturbed and unconcerned by the bare presence of the unanswered question. The defense was satisfied with preventing an answer. The incident, if it were error at all, was no more than harmless error which, under Fed.R.Crim.P. 52(a), we are to disregard.

C. The court's refusal of Castaldi's suggestion for a witness. Castaldi testified that he had been at Long's residence on May 24, the day of Long's arrest. There is no dispute as to this fact. On cross-examination he testified that he also had been at Long's home five or six times in the two months prior to May 24, and he denied that he had told a secret service agent that he had not been there during those two months. Agent Barton, called in rebuttal, stated that when he interviewed Castaldi the latter did deny having been at Long's home during that two month period. During cross-examination this agent's written report of that interview was, on demand, given to Castaldi's counsel. No request was made by the defense at that time to call any other witness.

After the jury had been charged and had retired, counsel for Castaldi made an "offer of proof" that the record reflect that police officer Weisbrod, who was or may have been present when Barton spoke to Castaldi, "could have corroborated" the defendant's story that he "did not deny being at Long's house on Sunday, May 24th". Castaldi claims error in the court's "rejection" of rehabilitation testimony from Weisbrod.

◼ In the light of the entire record the point does not seem to us to be a very important one. In any event, it has no merit. Counsel's language was hardly in terms of a request and seems to be nothing more than a statement dictated into the record. Further, coming after the jury had retired, it was, presumptively, made too late and the court's failure to call the officer does not impress us as an abuse of discretion. See VI Wigmore, Evidence, § 1880 (3d ed. 1940). Finally, the "offer" was directed to Castaldi's presence only on May 24 and not at all to the two month period preceding that date. Barton's testimony concerned that preceding period. The court carefully pointed this out but the offer was not rephrased and the matter was dropped.

◼ The record clearly reveals that Castaldi's trial counsel was vigorous and most ably protected his client. The point does not strike us as an appropriate plain error situation, under Fed.R.Crim.P. 52 (b), or as a denial of the compulsory process guaranty of the Sixth Amendment. See Feguer v. United States, supra, pp. 240–241 of 302 F.2d; Bandy v. United States, 296 F.2d 882, 887–891 (8 Cir. 1961), cert. denied 369 U.S. 831, 82 S.Ct. 849, 7 L.Ed.2d 796.

We are grateful for the work performed by Harry Gershenson, Jr., of the Saint Louis Bar, as court-appointed appellate counsel for the two defendants.

Both judgments of conviction are affirmed.