COMMONWEALTH *vs.* WILLIAM G. SULLIVAN & another.

Suffolk.     March 5, 1968. — July 2, 1968.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Search and Seizure. Arrest. Evidence,* Of identity, Presumptions and burden of proof, Admissions and confessions, Of alibi. *Identification. Constitutional Law,* Due process of law. *Practice, Criminal,* Trial of defendants together, Charge to jury, Assistance of counsel, Disclosure of evidence before grand jury, Mistrial, Argument by prosecutor. *Homicide. Jury and Jurors.*

Where it did not appear at the trial of an indictment for murder committed during an armed robbery that service of a default warrant for the arrest of the defendant for an unrelated crime was not appropriate and lawful when made on him about eight hours after the robbery by police officers who knew it had occurred, the arrest was not illegal even though the officers believed that the defendant was one of the robbers and wished to have him in custody on that account and believed that they might find a weapon used in the robbery; and there was no error in a failure by the judge to suppress as evidence a gun seized by the officers after they had observed it in plain sight in the defendant's possession when the arrest was made. [602–603]

At the trial of an indictment for murder committed during an armed robbery by two men, an unfired gun of an unusual type which was found in the possession of a defendant about eight hours after the robbery and which a witness testified looked like the gun pointed at him during the robbery was, with bullets to use in it found in the defendant's pocket, properly admitted in evidence as relevant, and introduction in evidence of a spent bullet fired from the gun by a ballistician to show that it had not been fired in the robbery did not prejudice the defendant. [603–604]

There was no merit in a contention by the defendant at the trial of an indictment for murder committed during an armed robbery in 1966 that he was denied due process of law contrary to the Fourteenth Amendment of the Federal Constitution by the judge's permitting testimony of a victim of the robbery identifying the defendant as the robber to stand after the facts were brought out pertaining to that victim's

identification of the defendant on the day after the robbery at three different places in which he was lawfully detained, where there was no basis for a conclusion that the prior confrontations were "unnecessarily suggestive or conducive to irreparable mistaken identification" [605]; or in permitting testimony of another witness identifying the defendant as one whom he had seen fleeing after the robbery to stand after the facts were brought out pertaining to that witness's identification of the defendant on the day after the robbery when observing him through a window at police headquarters while he could not see the witness, where there was no basis for a conclusion that in the prior observation the police sought to influence the witness or wanted more than his best judgment as to identity [605–606].

On the record, there was no abuse of discretion in the denial of a motion for a severance of trial by one of two defendants indicted for murder committed during an armed robbery on the ground that the moving defendant intended to use the testimony of his codefendant for exculpatory purposes. [606–607]

There was no error at a criminal trial in reading to the jury during the charge of the part of the charge in *Commonwealth* v. *Webster,* 5 Cush. 295, 319, pertaining to the defence of alibi where the trial judge made it plain that the prosecution must prove the defendant's guilt beyond a reasonable doubt "notwithstanding the defense of alibi" and that such defence did not place a burden on the defendant "to establish . . . [his] innocence." [607]

At the trial of an indictment against two defendants for a murder by shooting during an armed robbery, where there was evidence that the robbery was a joint enterprise of one of the defendants with some other person, that only one shot was fired, and that such defendant did not fire it, it was not error to charge that the jury could convict such defendant of first degree murder and acquit his codefendant. [608]

The constitutional right of the defendant in a murder case to an impartial jury representing a cross-section of the community was not violated by exclusion from the jury of all prospective jurors who said that they were opposed to capital punishment where there was nothing before this court, on appeal from the defendant's conviction of murder in the first degree, tending to show that jurors not opposed to the death penalty tend to favor the prosecution. [608–609]

At the trial of an indictment against two defendants for murder committed during an armed robbery of a railway express agency, a statement of one defendant to a third person, when that defendant and an employee of the agency saw each other at a court house a month after the robbery while that defendant was not in custody nor being detained and questioned, and was without counsel, "There is the big guy now." "Express job," was properly admitted in evidence as an admission against that defendant [609–610]; the statement did not implicate the other defendant and its admission was not precluded by a pre-trial stipulation that the Commonwealth would not introduce as part of its direct case admissions on the part of one defendant which would implicate the other [610].

Commonwealth *v.* Sullivan.

At a criminal trial, the judge reasonably construed an allowed pre-trial motion of the defendant for "copies of all statements alleged as admissions" made by him, and a bench colloquy, as indicating that the motion referred to written statements only and not to a spontaneous exclamation in the nature of an admission made by the defendant. [610–611]

Following testimony of a police officer at a murder trial as to an incriminating statement made by the defendant, the defendant did not show a particularized need to examine the grand jury minutes with respect to that statement where it did not appear that the officer had been a witness before the grand jury, and there was no error in the denial of the defendant's motions to inspect the minutes and for a mistrial. [611]

At the trial of an indictment for murder committed during an armed robbery, there was in the circumstances no error in the admission in evidence of a change in the color of the defendant's hair between a month after the robbery and the trial [612]; or in the exclusion of a conversation between an alibi witness and the defendant about a month after the crime [612]; or in the denial of a motion that the Commonwealth furnish the defendant with all evidence in its possession tending to exonerate him [613]; or in the exclusion of a question on cross-examination of the murder victim's daughter as to whether certain hospital records refreshed her recollection as to the ability of her father to communicate and to speak about a month after the robbery when the defendant was apprehended [613–614]; or in excluding a question to a police officer as to whether he had testified before the grand jury with respect to an admission by the defendant to which the officer testified at the trial [614]; or in cutting off cross-examination as to whether an unrelated suspect came to a police station voluntarily [614].

There was no merit in a contention by a defendant indicted for murder in the usual statutory form that there must be proof that the basis for the "finding of the grand jury is the same as that upon which the petit jury is asked to convict." [614]

It was not improper for the prosecutor at a criminal trial to call to the jury's attention a possible inference from the evidence. [614–615]

At a trial for murder committed during an armed robbery, where there was no evidence that the killing was with extreme atrocity or cruelty, there was no error in stating in the charge the three categories of first degree murder, but explaining in detail only the two categories of which there was evidence, and stating as to second degree murder only that murder which did not appear to be first degree murder was murder in the second degree. [615]

At the trial of two defendants for murder by shooting during an armed robbery of a railway express agency, evidence merely that the murder victim threw a box of checks which he was carrying at one defendant did not require the judge to charge on manslaughter or self-defence, and the evidence did not warrant any conclusion other than that the firing of the fatal shot by the other defendant was deliberate or in the course of an attempted robbery. [615–616]

At the trial of an indictment for murder committed during a robbery by

two men, where there was evidence that both men were armed and were acting together in an armed robbery, there was no error in the judge's failure to define armed robbery and attempted armed robbery. [616]

At a criminal trial in which the judge rightly instructed the jury that the verdict must be unanimous, there was no error in not instructing them that a decision of guilt should be the conviction of twelve minds and not merely that of a forceful majority or minority. [616]

Where, at a trial against two defendants for murder by shooting during an armed robbery, a gun found in one defendant's possession and identified as carried by him during the joint enterprise was admitted in evidence without objection by the second defendant, and the Commonwealth's evidence expressly showed that the fatal bullet was not fired from that gun, it was not error for the judge to decline to give an instruction that the gun was not evidence against the second defendant. [616]

At a criminal trial, it was not error for the judge to instruct the jury to draw no inference from the defendant's failure to testify, even though the defendant did not request such an instruction. [616–617]

INDICTMENT found and returned in the Superior Court on December 9, 1966.

Preliminary motions were heard by *Sullivan,* J., and the case was tried before him.

*David Berman (John F. Zamparelli* with him) for the defendant Sullivan.

*Robert A. Stanziani* for the defendant Reissfelder.

*Lawrence L. Cameron,* Assistant District Attorney, for the Commonwealth.

WHITTEMORE, J. The defendants have appeals under G. L. c. 278, §§ 33A–33G, from judgments of guilty of murder in the first degree. The jury having recommended that the death sentence be not imposed, the defendants were sentenced to life imprisonment.

On October 14, 1966, about 7:15 A.M. two men committed a payroll robbery at the premises of the Railway Express Agency at the South Station in Boston. As the robbers fled one of them (identified at the trial as Sullivan) fired a shot which hit an employee of the Agency, Michael Shaw, in the head. Only one shot was fired. Shaw died from the wound on December 2, 1966. The defendant Reissfelder was arrested on the day of the robbery, and with him was found a revolver which John Coleman, another Agency

employee, at the trial identified as the gun carried by
Reissfelder. The defendant Sullivan was arrested at the
Cambridge court house on November 14, 1966, following
Coleman's identification. Each defendant was identified
by eyewitnesses. A remark by Sullivan to a companion
overheard in the Cambridge court house tended to incrimi-
nate him.

### REISSFELDER'S ASSIGNMENTS OF ERROR.

1. *Failure to suppress as evidence a twenty-two calibre pistol.*

On the strength of a default warrant for the arrest of
Reissfelder in a "bad check" case, five or six police officers
about 3:45 P.M. on October 14, 1966, entered the apartment
of Martha Sternberg where Reissfelder, a friend of her son,
had spent the previous night. They saw Reissfelder hiding
behind a washing machine in a small room off the kitchen.
An officer said, "[W]e have a warrant for your arrest" and
took him by the arm. He stood up and the officers saw, on
the laundry bag on which he had been crouching, a ".22
long calibre Colt single action revolver" in a holster. An
officer testified that they did not go to the apartment look-
ing specifically for a gun but "looking for a gun . . . was
part of it." They knew there had been a holdup prior to
8 A.M. on that day. The officers did not then search the
premises. They did search the defendant and found seven
rounds of twenty-two calibre cartridges in his trousers
pocket.

It may be inferred that the officers took advantage of
the opportunity to make an arrest under the outstanding
warrant because of their belief or suspicion that Reissfelder
had been one of the robbers. In the circumstances we think
that this did not require the suppression of the gun as
evidence.

There is no suggestion that the warrant had been procured
as a pretext, or after the robbery, or that there had
been unreasonable delay in its service, or in any other re-
spect that it was not appropriate and lawful that it be then
served. Neither the wish of the police to have the defendant

under arrest at that time for another reason, nor their belief
that when they arrested him they might find a weapon used
in the crime of that morning, made the arrest a mere sham
or a pretext. Compare *Taglavore* v. *United States*, 291 F. 2d
262 (9th Cir.). In that case, in order to search the person
of a narcotics suspect, the officer made use of a warrant to
arrest the suspect for two minor traffic violations observed
by another officer the night before, as to which that officer
had been too "busy doing other police work" to take prior
action. The court, deeming the warrant only an excuse for
the search, ruled the search and the arrest illegal. We as-
sume that any search not reasonably related to or serving
the purpose of the arrest under the default warrant would
have been invalid. There was, in our view, no search. *Com-
monwealth* v. *Murphy*, 353 Mass. 433, 438. The gun was
in plain sight in the defendant's possession. See G. L.
c. 269, § 10. *Commonwealth* v. *Ballou*, 350 Mass. 751, 756.
If, however, observing and taking the gun were to be thought
of as involving a search, it was action directly related to the
arrest under the warrant. See *Terry* v. *Ohio*, 392 U. S. 1,
22–27; *Carlo* v. *United States*, 286 F. 2d 841, 845–848
(2d Cir.), cert. den. 366 U. S. 944.

The arrest was not illegal and there was no basis for sup-
pressing the gun. Compare *United States* v. *Harris*, 321
F. 2d 739 (6th Cir.). (No warrant; the one hour's search
for narcotics was held the primary purpose of the arrest;
search held invalid even though there was probable cause to
suspect narcotics violations.)

2. *The relevance of the gun and bullets found with Reissfelder.*

There was testimony that this was the gun that was
pointed at the witness Coleman. The most that the witness
could be taken as saying was that it looked like the gun.
The evidence was that it had not been fired. It was relevant
that the defendant when arrested had with him a gun of
the unusual type used in the robbery and also bullets to use
in that gun. The gun was an important part of the identifi-
cation of the defendant as one of the robbers. The intro-
duction of the spent bullet, fired by the ballistician from

this gun (sustaining his view that the gun had not been fired in the robbery), did not prejudice the defendant.

3.  *Testimony of witnesses identifying Reissfelder.*

Coleman testified that on October 14, 1966, shortly after 7:15 A.M. he was carrying a bag of money along the second floor corridor of the Agency's offices with Michael Shaw and John Esposito. A man (later identified as Reissfelder), came out of room No. 4 with a gun, grabbed the bag of money, pointed a gun at Coleman's stomach saying, "Give me the money." At first the three employees thought it was a joke. Shaw and Esposito kept walking down the corridor in a southerly direction. Coleman struggled with the man but when he heard "a click or two" from the gun, he let the bag go. The man then called to a companion in the men's room (later identified as Sullivan) who came out with a gun in his hand and said, "Get in the men's room." The hall was very dark. There was a light on in the men's room. There was a skylight. The jury took a view. The witness was able to see the face of the man who had come out of room No. 4. He was "face to face" with him. The man had black hair, or dark brown (seen at the sides of his head). He had on a "skully cap, like a longshoreman's cap or a golfer's cap," a "peaked cap," a dark blue jacket and sunglasses. He had olive skin and a five o'clock shadow. The witness had had the man under observation for up to thirty-five seconds. In the court room the witness pointed to the defendant Reissfelder as that man.

On October 15, at the court house of the Dorchester court (a district court in Boston), Coleman had "positively identified" Reissfelder as the man with whom he had struggled. The man was in a cell with several other men. The witness then went to the Roxbury court (another Boston district court), "[a]s far as . . . [he knew]," to look at Reissfelder, but he was not asked to do so. He then went to headquarters to identify Reissfelder and was there two hours before he did so. He "was not asked to identify anyone there" but he did see Reissfelder there with a detective at a desk.

After he identified Reissfelder, Coleman was shown many

photographs in the course of the police search for another man. He observed a man at police headquarters through a mirror that hid him from the observed person. The man walked around and talked. After about five minutes the witness said, "that wasn't the [other] man."

The defendant moved to strike Coleman's testimony after the testimony of prior identification at the Dorchester court had been elicited. *United States* v. *Wade,* 388 U. S. 218, was decided June 12, 1967. It does not apply to identification made prior to that date. *Stovall* v. *Denno, Warden,* 388 U. S. 293. As to the contention under the Fourteenth Amendment, we note first that the defendant does not contend that he was illegally detained at any of the places where he was observed. We think also that there is no basis for concluding that "the confrontation . . . was . . . unnecessarily suggestive or conducive to irreparable mistaken identification" (*idem,* 301–302). *Commonwealth* v. *Blackburn, ante,* 200, 203. *Commonwealth* v. *Bumpus, ante,* 494, 497–502 (point 2). The witness had been face to face with the man the day before. In looking at other pictures, searching for the other robber, he did not respond to the suggestion of the pictures or of police custody. The identification was prompt and certain. There is nothing in the defendant's attempt to suggest that only after three looks at different places was the identification made. It appears plain that the word "identify" (used to some extent in leading questions on cross-examination) has been used not only in the sense of recognition by the witness of his assailant, but also to state what he was to do at other places, to inform others who needed to know that the man was, in the witness's view, the assailant.

Alexander LaRusso, an Agency foreman, was at a counter on the first floor of the building on October 14, 1966, about 7:05 A.M. He heard a shot upstairs, and footsteps running down the stairs. He saw two men dressed in working clothes come down to a partition, turn, come down four steps and run past the receiving counter. He saw both of them for about five seconds and got a look at their faces. He identified

them in the court room as Reissfelder and Sullivan. Reissfelder said to him, "Stay still, don't move." They both had on dark glasses and dark jackets; dark blue, he thought. One was tall, the other short. The shorter man (Reissfelder) was thin. He had black hair and his complexion was dark. He had on a cap like a golfer's cap, with a peak.

. The next day at police headquarters he observed Reissfelder through a window but the defendant could not see him. The police did not ask him to identify the man. The officer did not say, "Does this look like the guy?" nor did he give a history of the man. It took the witness about a minute to identify the defendant. "I knew it was him right away." But he studied him. "There was no doubt in my mind." [1] He saw eight or nine pictures of Reissfelder on that day. He did not know whether it was before or after the identification. He discussed the identification of Reissfelder with the police a few times on the same day.

Reissfelder had seasonably excepted to the denial of a voir dire in respect of the basis of identification. That was before the testimony as to the headquarters viewing and identification was elicited. There appears no motion to strike LaRusso's testimony. There is in this testimony no showing of denial of due process. There is no basis for concluding that the police sought to influence the witness or wanted other than his best judgment as to whether Reissfelder was one of the men LaRusso had seen on October 14.

Later, eyewitness Esposito also identified Reissfelder in court. There was no evidence of prior confrontation between him and the defendant.

4. *Severance.*

Under our decisions, whether to order severance is in the court's discretion. *Commonwealth* v. *Fancy,* 349 Mass. 196, 204, and cases cited. The motion to sever was denied after hearing. The motion disclosed an intent to use the

---

[1] Q. "[Y]ou were not able to say 'That's the guy' right away . . . because you had some doubt as to the identification?" A. "Probably." Q. "[T]here was some doubt in your identification?" A. "There was no doubt in my mind."

testimony of Sullivan for exculpatory purposes.   However, what was specifically intended does not appear and there is no showing of abuse of discretion.   The defendant's brief points to the absence of evidence at the trial that the men had had a prior relationship.   We are unable to infer from this that Sullivan could or would have testified that they were unacquainted.   The defendant's argument that if he had called Sullivan to testify to nonacquaintance the jury might have thought that counsel knew something about Sullivan's participation or was seeking to shift the blame does not impress us as ground for ruling error in the denial of severance.

.   We can see nothing in the case of *United States* v. *Echeles,* 352 F. 2d 892 (7th Cir.) supporting a severance in the case at bar.

5. *The charge as to alibi.*

The jury were told:  "The burden of proof remains upon the Commonwealth to satisfy you beyond a reasonable doubt as to the guilt of the defendants here standing before you, notwithstanding the defense of alibi.   The burden does not thereupon shift to him or them to establish their innocence."   What burden of proof meant was defined. This defendant (and Sullivan) complain of the judge's reading part of the charge in *Commonwealth* v. *Webster,* 5 Cush. 295, 319.[2]  In context this did not shift the burden of proof and was not error.   *Commonwealth* v. *Rogers,* 351 Mass. 522.   The judge made plain that the prosecution has to prove its case notwithstanding the alibi.   Under the instructions the evidence supporting the defence of

---

[2] "This is a defence often attempted by contrivance, subornation, and perjury.   The proof, therefore, offered to sustain it, is to be subjected to a rigid scrutiny, because, without attempting to control or rebut the evidence of facts sustaining the charge, it attempts to prove affirmatively another fact wholly inconsistent with it;  and this defence is equally available, if satisfactorily established, to avoid the force of positive, as of circumstantial evidence.   In considering the strength of the evidence necessary to sustain this defence, it is obvious, that all testimony, tending to show that the accused was in another place at the time of the offence, is in direct conflict with that which tends to prove that he was at the place where the crime was committed, and actually committed it.   In this conflict of evidence, whatever tends to support the one, tends in the same degree to rebut and overthrow the other; andit is for the jury to decide where the truth lies."

alibi, like any other evidence favorable to the defendant, did not have to do more than raise a reasonable doubt of the defendant's guilt. It is not improper to point out to the jury that in weighing alibi testimony they should have in mind that an established alibi overcomes direct testimony however forceful.

6. *Other aspects of the charge.*

a. There is no basis for concluding that the judge unduly emphasized portions of the charge by vocal inflection or otherwise.

b. It was not error to charge that the jury might acquit Sullivan and convict Reissfelder. The evidence tended to show a joint enterprise with another person. Hence, Reissfelder, who did not fire the fatal shot, could be convicted of first degree murder, even if the other person was not Sullivan. The case of *Commonwealth* v. *McCarthy,* 348 Mass. 7, 14–15, concerned a new trial and is not in point.

## SULLIVAN'S ASSIGNMENTS OF ERROR.

7. *Excluding from the jury persons who said they were opposed to capital punishment.*

The wise and proper course is to determine from further questions whether a belief against capital punishment would interfere with a determination of the guilt of the defendant. *Commonwealth* v. *Nassar, ante,* 249, 256. But on this record it cannot be concluded that the defendant was prejudiced by the exclusion of persons who stated opposition to the death penalty. The issue is resolved by *Witherspoon* v. *Illinois,* 391 U. S. 510, and *Bumper* v. *North Carolina,* 391 U. S. 543. Accord, the *Nassar* case at pp. 255–257. We quote from the *Witherspoon* opinion (pp. 516–518): ". . . [The petitioner] maintains that such a jury, unlike one chosen at random from a cross-section of the community, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption

of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt. . . . The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." There are no data before us tending to show that jurors not opposed to the death penalty tend to favor the prosecution.

8. *Sullivan's incriminating admission at Cambridge on November 14, 1966.*

Detective Caruso testified that on November 14, 1966, he observed Sullivan in the second floor lobby of the Cambridge court house talking to another man; that he saw Coleman come up the stairs and look at Sullivan and saw Sullivan look at Coleman and then say something to the man beside him, after which he turned and picked up his coat and walked to the end of the corridor and sat on a bench.

Detective Nee testified that at the time he was standing about six feet from Sullivan, he saw the looks pass between Sullivan and Coleman and heard Sullivan say to the man he was with, "There is the big guy now." Then, after that man had looked toward the stairway and had said something to Sullivan, he heard Sullivan say, "Express job."

These were relevant admissions. The testimony of the two officers was complementary. There was no right to counsel. The defendant was not in custody, nor being detained and questioned. Compare *Commonwealth* v. *Wallace,* 346 Mass. 9, 16. It is irrelevant that three officers were nearby and went to Cambridge to arrest Sullivan. The statement was not encouraged or elicited or provoked by the police. Cf. *Massiah* v. *United States,* 377 U. S. 201, 206. Coleman had been asked to go to Cambridge

and look at Sullivan. The statement was not made to police officers. Cf. *Commonwealth* v. *McCarthy*, 348 Mass. 7, 10.

The pre-trial stipulation by the Commonwealth did not preclude the admission of the testimony. The stipulation was the basis of the denial of Reissfelder's motion for severance. Reasonably construed, it was that the Commonwealth would not introduce as part of its direct case confessions or admissions on the part of one defendant that would implicate the other.[3] Sullivan's admissions by words and associated conduct in no way implicated Reissfelder.

Sullivan's pre-trial motion for "a copy or copies of all statements alleged as admissions and/or confessions" made by him was allowed. This reasonably related to written statements and not to the spontaneous remark at the Cambridge court house. It was not the equivalent of a motion for a disclosure of oral testimony. In colloquy Sullivan's attorney said as to his "motion for copies of statements . . . if there was an admission or confession, whether it is direct or otherwise, I'd like to know." The assistant district attorney answered, "I have no way of knowing just what you mean. If there were some statements made by Mr. Sullivan, I have no statement of Mr. Sullivan." This remark by itself might be ambiguous, but it is to be read as related to the motion. So read, it concerned statements of which copies could be made. The construction of the motion and the colloquy was for the judge. It was reasonable to construe them, as he did in effect by admitting

---

[3] THE JUDGE: "The District Attorney has represented to me that there is no issue of confession; that no confession from either party is to be offered." COUNSEL FOR REISSFELDER: "Does he also suggest, no statements of any kind that implicate one or the other?" THE ASSISTANT DISTRICT ATTORNEY: "In my direct case, I do so represent. But I shouldn't be limited if something is opened on cross examination that I need admissions which might have been made." THE JUDGE: "But your representation applies to your direct case?" THE ASSISTANT DISTRICT ATTORNEY: "In my direct case, I do not intend to introduce any statements, whether they be confessions or admissions of either of the defendants." THE JUDGE: "Of either of the defendants, neither confessions nor admissions on the part of one defendant vis a vis the other?" THE ASSISTANT DISTRICT ATTORNEY: "That's right." THE JUDGE: "In that case, your motion for severance in the Reissfelder [case] is denied."

the testimony, as not applying to evidence of Sullivan's spontaneous exclamation. Although the judge at first indicated that he thought the evidence went against the prosecutor's statement, when, after reflection, he admitted the testimony, he made no further reference to that aspect of the matter.

9. *The motions to see the grand jury minutes and for a mistrial.*

After Officers Caruso and Nee had testified and Officer Donovan had testified that he had heard Sullivan say, "There is the big guy," the defendant renewed his motion, previously denied, to inspect the grand jury minutes. He also moved for a mistrial.

Officers Caruso and Nee testified that they did not testify before the grand jury. Officer Donovan was asked if at any time before the grand jury he repeated what he heard as he stood at the railing in the court house. He had started to answer "I was never" when the prosecutor's objection was sustained. Sullivan's attorney offered to prove that his answer would be "that he did not make any such observation or statement at any Grand Jury proceeding in connection with this alleged robbery concerning Sullivan."

The record at this point does not tell us whether Officer Donovan would have answered, "I was never asked" or "I was never called before the Grand Jury." The offer of proof is not an offer to show that Donovan was before the grand jury or that he was asked the question. But, in any case, at the argument our attention was called to the Commonwealth's answer to the motion to furnish the names of witnesses before the grand jury (paper No. 19). The names supplied were Sergeant Richard Crowley, John Coleman, Francis Paine and Dr. Richard Ford. We conclude that the defendant does not, as he now argues, show a particularized need (*Commonwealth* v. *Doherty*, 353 Mass. 197, 210), for the grand jury minutes.

For the reasons stated it was not error to deny the motion for a mistrial.

10. *Rulings as to evidence.*

a. It was not error to permit introduction of the color of the defendant's hair on October 27, 1966, and November 14, 1966. A police officer testified that on November 14, 1966, when arrested, the defendant's hair was either blonde or light brown; other witnesses testified that Sullivan's hair was much lighter at earlier times than it was during the trial. A chemist testified that in the five months prior to the trial (held in July, 1967) the defendant's hair had not been dyed. The assistant district attorney asserted in the course of the argument over the admissibility of the officer's testimony that at the trial the defendant's hair was dark brown or black. This was not disputed. Coleman had testified that on October 14, 1966, the assailant identified as Sullivan had blonde hair. In the court room this witness looking at the defendant said his hair was "sandy." We see no basis for claim of error. That Sullivan's hair was more nearly blonde one month after the murder than at the trial bore on the sureness of the identifications of Sullivan as the assailant, and as a man with blonde hair.

b. An alibi witness testified that about a month after the crime he talked with Sullivan. He then recalled having seen the defendant on October 14, 1966, at Dot's Diner in Charlestown, where he goes every morning. He would say it was "between 7, about 7:20." He recalled in the November talk something said on October 14 that was "a special reason why [he] can remember" that morning as a morning when they were together. The conversation was excluded. The offer of proof was that he asked Sullivan if he was working, and Sullivan said, "Yes. I am finishing up on the Black Falcon." The witness had said, "Oh, the jinx ship (a ship on which friends of the witness had met their deaths). On cross-examination he testified that he saw Sullivan at the diner "many, many mornings." There was nothing in the excluded conversation to fix anything more than that at some time the witness and Sullivan had talked about his finishing up on the Black Falcon. That might have been any day. The ruling was within the judge's discretion and was not erroneous.

Later the defendant offered evidence that Sullivan worked on the Black Falcon on October 13 and 14 and that the unloading of the ship ended on October 14. We assume without deciding that the excluded evidence might have been deemed admissible on the ground that, with the later evidence, it had some tendency to fix the dates. There was no offer of proof in respect of this, and the proffer of the excluded evidence was not renewed. The brief argues only that it was error to exclude the conversation that the defendant had said he was working on the Black Falcon, regarded as a jinx ship. Compare *Commonwealth* v. *Fatalo,* 345 Mass. 85, 87–88.

c. No prejudice is shown from the denial, after hearing, of the motion that the Commonwealth furnish all evidence in its possession tending to exonerate the defendant. The motion was not specific and the defendant suggests no evidence that might have helped him. There is no basis for assuming that there was such evidence. The Commonwealth says in its brief that the defendant apparently believes "the [hospital] records may have been useful in cross-examining the deceased's daughter as to her recollection of his ability to speak and communicate, and therefore identify [the] defendant." It does not appear that this possible use of these records was suggested when the motion was denied on July 12, 1967. The transcript, in any case, indicates that the defendant had hospital records and attempted to use them with Shaw's daughter as shown in section (d) next following.

d. It was undisputed that Shaw could recognize persons and communicate at least some of the time up to about four days after Sullivan's arrest. The medical examiner testified that, as he concluded from the hospital records, up to November 18, 1966, or a little later, "some portion of that time" the deceased was able to speak, see and walk. Shaw's daughter testified in effect that she could understand him when she took him home from the Boston City Hospital on November 1, 1966, only if he talked very slowly. Prior to November 1, he talked with her and knew

her.    The defendant's counsel then asked to have the
witness look at the hospital records for Shaw's discharge on
November 1.   The records stated that "he was able to speak
and communicate well."    An objection was taken to the
exclusion of the question whether that refreshed her recol-
lection as to whether he could communicate well and was
able to speak.

There was certainly no prejudice in this.   If, after Sullivan
was apprehended, the deceased, whether he could talk well
or poorly, could have in any way signified that he recog-
nized Sullivan, the police could appropriately have had a
confrontation, assuming that a suitable and secure place
could have been selected.   The defendant's advantage in
showing that there was no confrontation was not lessened
by the ruling.

e. There was no error in excluding the question to Officer
Donovan whether he had repeated his testimony as to
the corridor admission by Sullivan to the grand jury.   See
point 9, *supra.*

f. Whether an unrelated suspect came to the police station
voluntarily was a collateral issue not requiring cross-
examination.

11. *Other rulings.*

a. It was not error to decline to direct a verdict.   The
indictment was in the usual statutory form.   Defendants
may have specifications.   We do not consider the point
valid that there must be proof that the "finding of the Grand
Jury is the same as that upon which the [P]etit [J]ury is
asked to convict."

b. The prosecutor referred in argument to the testimony
about Sullivan's hair and then in effect asked the jury to
conclude from the testimony that the hair was lighter on
October 14 and November 14 than its natural state at the
time of trial, and that it had been changed at the prior
time as a disguise.   He suggested that robbers do disguise
themselves. This was no more than calling attention to a
possible inference from the evidence.

It was unnecessary for the court to instruct that this

argument was not evidence. Of course it was not. The judge instructed what was evidence — testimony, exhibits, and documents, and that the jury's task was to evaluate the testimony of all the witnesses.

12. *The charge.*

a. As to alibi.

There was no error in this aspect of the charge. See point 5, *supra.*

b. The degrees of murder.

It was not error to state the three categories of first degree murder. There was no suggestion that the jury could find a killing with extreme atrocity or cruelty. The judge explained in detail only malice aforethought and felony murder and did not err in so doing. He concluded this part of his charge by stating that if the murder was committed with malice aforethought or in the commission or attempted commission of a crime punishable by death or imprisonment for life it was first degree murder.

In then stating that murder which does not appear to be in the first degree is murder in the second degree, the judge adequately charged as to second degree murder.

c. Manslaughter or self-defence.

There was no evidence which would warrant any conclusion other than that the firing of the gun was deliberate or in the course of an attempted robbery.

The witness John Coleman testified that after he entered the men's room he saw the defendant Sullivan standing at the doorway holding it open with his foot. Sullivan had a gun in his hand and was pointing it down the hallway in the southerly direction in which Esposito and Shaw had walked. Sullivan fired a shot "down the hall." The door closed. He heard footsteps running and someone say, "Come on. Let's go." After ten or fifteen seconds he came out and saw Shaw lying there bleeding from his head.

The witness John Esposito had testified that after Reissfelder had said, "I mean business; drop it," Shaw threw a box of checks he was carrying. The inference is he threw it at Reissfelder. In any event the act did not

furnish a basis for a manslaughter instruction. This, of course, was not "sudden combat." The witness then went into room No. 5, heard a shot, and went out the window.

Francis Paine, an employee, testified that on the morning of the murder he came up the stairs, saw Coleman approaching with a man behind him (whom he identified as Sullivan) with a gun in his hand; the man stopped and said, "Get in there," indicating the men's room. Coleman and the witness went in the men's room, the door was ajar, and Sullivan raised the gun, "closed the door, and fired a shot practically at the same time."

d. Armed Robbery.

It was not necessary to define armed robbery and attempted armed robbery. The only evidence was that both men were armed and that they were acting together in an armed robbery.

e. Unanimity.

The judge rightly instructed that the verdict must be unanimous. It was not necessary to emphasize by further instructions that the decision of guilt should be the conviction of twelve minds and not merely that of a forceful majority or minority.

f. Reissfelder's gun.

It was not error to decline to instruct that the gun found with Reissfelder and identified as carried by him, and admitted without objection by Sullivan, was not evidence against Sullivan. The Commonwealth's evidence expressly showed that the bullet which killed the deceased was not fired from that gun. It was admitted in evidence as a weapon carried by one of the two robbers in their joint enterprise, not as possibly the murder weapon. See *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 229–230. The other evidence showed without doubt that Sullivan's companion, whoever he was, carried a gun answering the description of this one. It did not strengthen the case against Sullivan that such a gun was in evidence.

g. Failure to testify.

It was not error to charge, without a request, that the jury

should draw no inference from the defendant's failure to testify. The court had an obligation to see that the defendant was fairly tried. We are not impressed with the suggestion that this instruction brought the failure to testify into the jury's area of speculation, where it might not otherwise have been.

### CONCLUSION.

We have considered all the assignments of error that have been argued and have reviewed the transcript. We see no basis for ordering a new trial under G. L. c. 278, § 33E.

*Judgments affirmed.*