COMMONWEALTH *vs.* DANIEL R. CONNOLLY
(and a companion case [1]).

Essex.   October 6, 1969. — January 28, 1970.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, SPIEGEL, &
REARDON, JJ.

*Jury and Jurors. Constitutional Law,* Due process of law, Equal pro-
tection of laws, Trial by jury, Assistance of counsel. *Identification.
Practice, Criminal,* Assistance of counsel, Fair trial. *Search and
Seizure. Evidence,* Illegally seized material, Presumptions and burden
of proof, Cumulative evidence, Of disposition, Impeachment of credi-
bility, Of bias. *Homicide. Accomplice.*

Nothing appeared in a murder case to support a contention by the de-
fendants that exclusion from the jury of prospective jurors who ex-
pressed opinions against capital punishment but who were not shown
to have been unable to make a fair determination of guilt resulted
in a jury which was prosecution prone and so was incapable of render-
ing a fair verdict and deprived the defendants of due process of law
[622]; nor was there merit in a contention by the defendants that the
exclusion resulted in a jury which did not constitute a true cross-
section of the community and so denied them due process of law and
equal protection of the law [622–623].
A confrontation of defendants arrested for murder by shooting and an
eyewitness wounded during the shooting, in a hospital room shortly
after the murder and the arrest and while the defendants were without
counsel, in the circumstances was not so unnecessarily suggestive and
conducive to irreparable mistaken identification as to deprive the
defendants of due process of law, and there was no error in the admis-
sion of the eyewitness' testimony that in such confrontation she had
identified the defendants as the murderers, irrespective of whether
her wounds were then so critical that haste in identification was es-
sential. [623–624]
A search of the basement of an apartment house by police with a warrant
to search an upper floor apartment of the building, but not its base-
ment, was lawful where the basement was a common area available to
all tenants and the search was made pursuant to permission given by
a tenant. [624]
In a criminal case, the legality of a search by police was not presented to
this court upon appeal from the defendants' conviction where there was

---

[1] Commonwealth *vs.* Richard J. Cote.

Commonwealth v. Connolly.

no motion before trial to suppress evidence concerning articles seized
in the search, or motion for a voir dire when the evidence was offered,
or excuse for lack thereof shown. [624-625]

The burden on the defendants in a criminal case of showing that a seizure
of articles found in a search under a warrant was, as they alleged,
illegal on the ground that such articles were not mentioned in the
warrant was not sustained where the warrant was not introduced in
evidence. [625]

Hearsay testimony by a ballistics expert at a trial for murder by shooting,
that pellets found in the victim's body were taken from his chest
cavity, was merely cumulative of testimony by the medical examiner
who performed an autopsy and did not prejudice the defendants.
[625]

At a murder trial in which a police officer testified that he knew the
victim, there was no error in the exclusion of a question to the officer
on cross-examination as to whether he "knew . . . of . . . [the vic-
tim's] vicious propensities." [625-626]

At a criminal trial in which a defendant took the stand, there was no
error in permitting the prosecutor, while seeking on cross-examination
to impeach the defendant's credibility, to read to the jury in its en-
tirety a record showing not only that the person named therein had
been convicted of and sentenced for assault and battery upon a plea
of guilty thereto but also that the charge against such person had been
rape, and to ask the defendant if he was such person. [626-627]
Kirk, J., dissenting.

At a murder trial, where great latitude was afforded defence counsel in
their cross-examination of a woman who was the only eyewitness to
the homicide, there was no abuse of discretion in excluding questions
to her, to establish bias, allegedly relating to various details of her
amorous involvement first with one of the defendants and then with
the victim. [627-628]

At the trial of two defendants for murder in the first degree, evidence that
one of the defendants, in the presence of the other defendant, fired a
gun five times point blank at the victim, who then managed to crawl
into his automobile, that the defendants left the scene in their
automobile and returned a few minutes later, that the same defendant
then shot the victim again through the window of his automobile, that
the victim had been conscious during part of the shootings, and that
the victim sustained extensive gunshot wounds and died as a result
thereof warranted submission to the jury of the issue whether the
murder was committed with extreme atrocity or cruelty. [628]

At the trial of two defendants for murder in the first degree, convic-
tion of one defendant as a principal was warranted by evidence that he
drove in his automobile with the second defendant to another State
and there assisted him in the purchase of a rifle, that the next day the
first defendant was driving his automobile around with the second
defendant and his rifle in it when they encountered the victim in his
automobile and both automobiles stopped, that the first defendant
got out of his automobile with the second defendant and stood by and

watched him shoot the victim five times and then twice shoot a woman in the victim's automobile, that the first defendant then drove away from the scene with the second defendant, drove back there shortly thereafter, and watched the second defendant shoot the victim again, and that the first defendant then escaped with the second defendant. [629]

Two INDICTMENTS found and returned in the Superior Court on January 8, 1968.

The cases were tried before *Thompson,* J.

*Alfred P. Farese (Ignatius R. J. Piscitello* with him) for the defendant Cote.

*Joseph Sax,* for the defendant Connolly, submitted a brief.

*Howard J. Camuso,* Assistant District Attorney, for the Commonwealth.

SPALDING, J.    Under indictments charging them with the murder of one John Chwalek, the defendants, Daniel R. Connolly and Richard J. Cote, were found guilty of murder in the first degree, with a recommendation that the death sentence be not imposed.   The defendants appealed.   G. L. c. 278, §§ 33A–33G.

The evidence relating to the homicide came from one Sylvia E. Haggar, an eyewitness, whose testimony in substance was as follows.   On the evening of November 30, 1967, while riding with Chwalek in a motor vehicle on Water Street, Lawrence, she observed a green car containing the two defendants and a third person unknown to her. The car was driven by Cote.   Chwalek sounded his horn to signal to the driver of the green car to pull over.   The two cars turned into Mason Street and stopped, Chwalek's car being a few feet behind the green car.   Chwalek got out of his car and approached the green car.   The three occupants of the green car also got out and words were exchanged. One of the occupants of the green car (not identified) took a gun out of the trunk.   Connolly, who was then holding the gun, said to Chwalek, "I am going to shoot you." Thereupon, Connolly stepped back two or three feet and fired about five times at Chwalek, who fell to the ground. Connolly then went over to Chwalek's car and fired two

shots at Sylvia Haggar, wounding her. Chwalek crawled back to his car. The other car was heard to leave. A few minutes later this car, driven by Cote, returned. Connolly got out and went over to Chwalek's car, put the gun in the window and fired. Cote yelled, "Come on, Danny, come on, Danny; they're both dead. Let's get out of here."

There was medical evidence that Chwalek died of multiple gunshot wounds of the chest and extremities, with extensive destructive wounds of the heart and lungs.

Connolly's version of the shooting differed materially from that just recited. According to him, Chwalek had threatened Connolly with a gun several times prior to November 30, the date Chwalek was shot, and on one occasion had struck him in the face with a revolver and had punched his wife in the face. On the night of the shooting, Chwalek, after forcing the green car over to the side of the road, approached with a shotgun and ordered Connolly out of the car. Connolly picked up a .22 calibre rifle and got out of his car. Chwalek then fired his shotgun at Connolly but missed him. Connolly tried to "duck behind the car" and in doing so his gun "went off." A struggle ensued over the possession of the shotgun and during it the shotgun went off. The defendants then drove away and did not return.

The defendant Cote did not take the stand. There was evidence that he participated in the purchase of the .22 calibre rifle used to shoot Chwalek, was the owner and driver of the green car, was present throughout both shootings, and drove Connolly back to the scene after the initial shooting.[1]

The police arrived shortly after the shooting. Officer Ouellette, after talking with Sylvia Haggar, arrested the defendants in a third floor apartment at 39 May Street,

---

[1] The evidence concerning the purchase of the rifle was as follows. On November 29, 1967, the day before the shooting, Connolly and Cote went to a sporting goods store in Derry, New Hampshire. Connolly at first wanted to purchase a handgun but was told that he needed a license to carry one. He then inquired if he could purchase a rifle without a license and was told that he could but would have to show some identification. Having none, Connolly asked Cote if he had his driver's license. Upon its production by Cote, the proprietor of the store made out a sales slip in Cote's name and sold the rifle to Cote. Connolly then handed Cote the money to pay for the rifle.

Lawrence.  They were first taken to the Lawrence police station and thence to a hospital where Sylvia Haggar identified them as the men involved in the shooting.  Officer Ouellette then obtained a warrant to search the apartment in which the defendants had been arrested.  Permission was granted by a second floor tenant to search the cellar, where under the stairs a .22 calibre rifle was found.  There was testimony by a ballistics expert that this rifle had fired the bullets found in Chwalek's body.  Another witness testified that this was the rifle he had sold to Cote on November 29.  A second warrant was obtained to search the green car, which was parked across the street from the apartment where the defendants were arrested.  During a search of the car some .22 shells were found.

1.  Both defendants assign as error the denial of their motions for mistrial because of the composition of the jury.  Eight veniremen were challenged for cause after expressing opinions against capital punishment.  In the case of one, the judge did inquire specifically into the impact of his belief on his ability to assess guilt and found that he did not stand indifferent.  Four of these veniremen were excused after it became clear that their opinions would impede an objective consideration of the appropriate sentence;  there was no inquiry, however, as to whether guilt determination would be likewise impaired.  Three of the eight veniremen, however, were excused without any attempt to relate their opinions to the matter of either guilt determination or sentencing.

General Laws c. 278, § 3, states that a person "whose opinions are such as to preclude him from finding a defendant guilty of a crime punishable with death shall not serve as a juror on the trial of an indictment for such crime."  This provision prohibits that class of persons, whose opinions on capital punishment impair their ability to determine guilt fairly, from serving on a jury.  It says nothing about the effect on the fairness of a trial when persons opposed to capital punishment but not shown to be unable to make a fair determination of guilt are excluded from the jury.

Since the death sentence was not imposed the rule laid down in *Witherspoon* v. *Illinois,* 391 U. S. 510, is not applicable. The defendants argue that such an exclusion denies the right to be tried by an impartial jury made up of a cross-section of the community, as guaranteed by the Sixth and Fourteenth Amendments. The defendants are actually making two separate arguments. The first is that a jury so composed is a "stacked jury," i.e., one that is prosecution-prone and incapable of rendering a fair verdict, and so violates due process. *Bumper* v. *North Carolina,* 391 U. S. 543, rejected this argument by holding that there was not sufficient evidence to show that juries culled of those opposed to the death penalty were more likely to convict. That is the situation here; the defendants have produced nothing that would justify our departing from the holding in the *Bumper* case and our decision in *Commonwealth* v. *Sullivan,* 354 Mass. 598, 608–609. But, as we observed in the *Sullivan* case, "[t]he wise and proper course is to determine from further questions whether a belief against capital punishment would interfere with a determination of the guilt of the defendant." P. 608.

The defendants' second argument is that there is an equal protection right to be tried by a jury composed of a cross-section of the community. When, it is argued, persons who have opinions against capital punishment are excluded, the resulting jury does not constitute a true cross-section of the community. Objectors to capital punishment, we are told, constitute a significant segment of the community. The defendants thus are asking us to adopt a rule of jury selection based on equal protection grounds, which forbids exclusion of veniremen solely because of their opinions against capital punishment, regardless of a showing of actual prejudice in the verdict. We know of only one case which lends support for a holding that an opinion on capital punishment could constitute a class of persons who could not be excluded consistently with equal protection. In *Crawford* v. *Bounds, Warden of Central Prison,* 395 F. 2d 297 (4th Cir.), decided by seven judges sitting en banc, two of

the judges rested their decision for reversal on equal protection grounds. While we recognize that objectors to capital punishment do represent a substantial segment of the community, and that seven jurors were here excluded for an opinion not shown to impede objective appraisal of guilt, we do not find the equal protection argument convincing. The requirement that a jury be representative of all elements of the community is a device that insures impartiality, and thus helps meet the Sixth Amendment's requirement of an impartial jury. The equal protection argument thus merges into one of due process, and appears but another way to assert that a jury from which significant segments of public opinion have been excluded is inherently unfair. Because of our disposition of the defendants' due process contention we are not prepared to say that the composition of this jury impaired "the . . . integrity of the fact-finding process," [1] and thus violated due process or equal protection. We hold that the judge did not err in denying a mistrial because of prejudicial error in the selection of the jury.

2. The defendants allege a denial of due process and the right to counsel in the admission, subject to their exceptions, of Sylvia Haggar's testimony concerning her identification of the defendants in a hospital room immediately after their arrest without counsel being present. Since no question is presented about the validity of an in-court identification when preceded by a tainted prior identification, *United States* v. *Wade*, 388 U. S. 218, and *Gilbert* v. *California*, 388 U. S. 263, are inapposite. Rather the question is whether the confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification that the defendants were denied due process of law. *Stovall* v. *Denno, Warden*, 388 U. S. 293. As in the *Stovall* case, the identification occurred in a hospital room shortly after arrest. We deem it immaterial whether Sylvia Haggar's wounds were so critical that haste, as in the *Stovall* case, was essential if any identification at all was to occur, for as we

---

[1] *Linkletter* v. *Walker, Warden*, 381 U. S. 618, 639.

recently held in *Commonwealth* v. *Bumpus*, 354 Mass. 494, 501, an identification by a witness to a crime, without the presence of counsel, is admissible in evidence if reasonable in the light of all the circumstances. Here, as in the *Bumpus* case, it was a reasonable police procedure to confront the two suspects immediately after arrest with the witness implicating them in the crime, to insure that the proper parties had been identified. We are of opinion that the *Bumpus* case is controlling and that Sylvia Haggar's testimony was rightly admitted.

3. The defendants contend that the admission of a rifle, testimony pertaining to its seizure, and evidence of Cote's purchase of the rifle were excludable as fruits of an illegal search. A search warrant had been issued to search the third floor apartment, but not the basement, of a house on 39 May Street. The rifle was found under the stairs during a search of the basement. It appears that a tenant of 39 May Street gave permission to a police officer to search the basement. Since the basement was a common area freely available to all the tenants, one tenant could give permission to its search. "One having equal authority over premises may authorize a search of them." *Drummond* v. *United States*, 350 F. 2d 983, 989 (8th Cir.). *United States* v. *Sferas*, 210 F. 2d 69, 74 (7th Cir.). *Teasley* v. *United States*, 292 F. 2d 460, 464 (9th Cir.). The search, therefore, was lawful and there was no error in admitting this evidence.

4. The defendants also object to the introduction of evidence relating to the seizure of .22 calibre shells from the defendant Cote's car. A police officer noticed the shells on the floor and in the glove compartment of the automobile. A search warrant, it is asserted, was procured for the purpose of searching the car, and listed as items to be seized a 12-gauge shotgun and a .22 calibre rifle, but failed specifically to mention the shells. We do not reach the question of the legality of the search, for the point is not properly before us. The defendants made no motions to suppress the evidence before the trial commenced. See Rule 101B of the Superior Court (effective June 1, 1965). Nor did they seek a voir dire

when the evidence was offered. As we stated in *Common-wealth* v. *Lewis*, 346 Mass. 373, 382, "Generally, an attempt to exclude such testimony is not timely if made for the first time when the evidence is offered at the trial." Nor have the defendants shown any excuse for this failure. More-over, the burden of establishing the illegality of a search rests with the moving party. *Commonwealth* v. *Fancy*, 349 Mass. 196, 202. The defendants' objections are predi-cated on the theory that the evidence introduced pursuant to the search differed from the items specified in the warrant. The warrant, however, is not before us; nor does it appear to have been introduced in evidence. Thus we have no way of knowing whether the search exceeded the mandate in the warrant. The burden of establishing error was on the defendants and they have failed to sustain this burden.

5. One Hallice, a ballistics expert called by the Common-wealth, testified on direct examination that two pellets found in Chwalek's body were taken from the "chest cavity." On cross-examination the witness admitted that his reference to the "chest cavity" was based on what he had been told by another witness. The defendants then moved that Hallice's testimony be struck; this motion was denied, subject to the defendants' exceptions. The de-fendants argue that Hallice's testimony was outside his field of competence and was based on hearsay. These arguments do not merit extended discussion. The autopsy in which the pellets were discovered was performed by Dr. Luongo, the medical examiner, in the presence of Hallice. Moreover, Dr. Luongo had previously testified to having found the pellets in the chest cavity. Thus Hallice's testi-mony was merely cumulative and could not have preju-diced the defendants.

6. Captain Schiavone of the Lawrence police department testified that he knew Chwalek. On cross-examination Connolly's counsel asked him the following question: "Officer, knowing him that well and having had some experience with him you knew, did you not, of his vicious propensities?" This question was excluded, subject to

Connolly's exception. There was no error. In a homicide case, where self-defence is invoked by a defendant, evidence of the victim's reputation for quarrelsomeness or violence is admissible, if known to the defendant. *Commonwealth* v. *Tircinski*, 189 Mass. 257. *Commonwealth* v. *Rubin*, 318 Mass. 587, 588. It is the victim's reputation and not the private opinion of a witness that is admissible. *Commonwealth* v. *De Vico*, 207 Mass. 251, 253. See *Clark* v. *Eastern Mass. St. Ry.* 254 Mass. 441, 443; Leach and Liacos, Handbook of Massachusetts Evidence, p. 252. The excluded question was not directed to Chwalek's general reputation for quarrelsomeness. Rather it sought to elicit the private opinion or knowledge of the witness.

7. The defendant Connolly took the stand. During his cross-examination by the Commonwealth several records of convictions were offered to impeach his credibility. In each case the prosecutor, reading from the record, asked Connolly if he were the person named in the record, and, after establishing that he was, introduced the record. After several such instances, the prosecutor asked the following question: "Sir, are you the same Daniel Connolly . . . [as to whom it was charged that] on the 29th day of July, 1963, . . . [he] did assault Beverly Neubert with intent to commit rape upon her and her, the said Beverly Neubert did commit rape upon, and . . . [who] on September the 12th — . . . in Essex Superior Court, number 53742, . . . pleaded not guilty, and during the trial on October the 11th, 1963, . . . retracted the plea of not guilty, and pleaded guilty to assault and battery . . . and . . . [was] sentenced to two years in the House of Correction, are you that same person, sir." While the question was being asked counsel for Connolly objected but the court allowed the question to be completed. Counsel for both defendants then moved for a mistrial. The judge denied the motions subject to their exceptions.

The defendants argue that the question was prejudicial because it informed the jury that Connolly had been charged with the crime of rape, but had actually been convicted of

no more than the lesser included offence of assault and battery.

To impeach credibility by showing convictions for past crimes the only evidence admissible is the record of the conviction itself. This rule is recognized in the statute governing the subject of impeachment by convictions, which speaks of the "record of his conviction" and by our decisions construing the statute. *Commonwealth* v. *Homer*, 235 Mass. 526, 536. *Commonwealth* v. *Danton*, 243 Mass. 552, 554. *Commonwealth* v. *Hayes*, 253 Mass. 541. It is obvious that the prosecutor was attempting to show a conviction by the only method available to him, namely, by reading the record of the conviction, and upon the defendant's admission that he was the person named therein, by introducing it in evidence. The defendant Connolly does not contend that the prosecutor was not reading from the record, or that the matter objected to was not contained in it.[1] What the prosecutor was attempting to do was in compliance with the law and the judge did not err in allowing the question.

8. The defendants excepted to the exclusion of fourteen questions asked during an extensive cross-examination of the witness Sylvia Haggar, the only eyewitness to the homicide. These questions are alleged to relate to various details of Sylvia Haggar's amorous involvement first with Connolly, and then with Chwalek. The defendants argued that the exclusion of these questions was erroneous because they tended to establish a bias in the witness against the defendant Connolly. Nothing would be gained by a minute examination of these questions [2] and their relationship to the weight of Sylvia Haggar's testimony. In a cross-examination which consumes more than 600 pages of the transcript, defense counsel had full opportunity to establish bias on the part of Sylvia Haggar and, in particular, to

---

[1] At one point the prosecutor attempted to put the record in evidence, but for some reason, not apparent to us, it was never received in evidence.

[2] Of the fourteen questions objected to, seven (numbers 5, 8, 10, 11, 12, 13 and 14) were unrelated to any issue of bias.

portray in considerable detail her shifting relationships with Connolly and Chwalek. Viewing the great latitude of the entire cross-examination, we find no abuse of discretion in excluding these questions.

9. One of the issues submitted to the jury was that of murder by extreme atrocity or cruelty. The defendants argue that there was no basis in the evidence for submitting this issue, and excepted to that portion of the charge which permitted the jury to pass on it. The fact, to quote from the defendants' briefs, that Chwalek died by "what is probably the most common and ordinary means of producing death, i.e., a gunshot wound," is not determinative of this question. To authorize the submission of this question to the jury, "the evidence must be of such a character as to show that the crime was committed under circumstances indicating something more than ordinary atrocity or cruelty." *Commonwealth* v. *Knowlton,* 265 Mass. 382, 388. Since any destruction of human life invariably includes some atrocity or cruelty, one cannot easily separate degrees of cruelty or atrocity by precise legal rules. Our cases have usually looked to the consciousness and degree of suffering of the victim, the disproportion between the means actually needed to inflict death and those employed, the instrumentalities employed and the extent of physical injury. The final determination of whether extreme atrocity or cruelty exists, however, must be decided by the jury, who, as the repository of the community's conscience, can best determine when the mode of inflicting death is so shocking as to amount to extreme atrocity or cruelty. Here, one of the defendants fired a gun five times point blank at the victim, who then managed to crawl back into his automobile. The defendants then returned, and one of them shot the victim again through the window of the car. Medical testimony showed that the chest wall and heart were fragmented and widely dispersed throughout the body. The extent of these wounds, the repeated shooting of the victim, during part of which he was conscious, warranted the submission of this question to the jury. *Commonwealth* v.

*Devlin,* 126 Mass. 253. *Commonwealth* v. *Feci,* 235 Mass. 562, 571. *Commonwealth* v. *Devereaux,* 256 Mass. 387, 388. *Commonwealth* v. *Knowlton, supra. Commonwealth* v. *Doherty,* 353 Mass. 197.

10. At the close of the Commonwealth's case, and again at the conclusion of the defendants' case, Cote moved for a directed verdict of not guilty. The motions were denied, subject to Cote's exceptions.

Cote argues that the evidence was not sufficient to warrant a submission of his case to the jury. We disagree. One who does not commit a crime with his own hands, but was present, aiding and abetting in the commission thereof, is guilty of the crime as a principal in the second degree. *Commonwealth* v. *Knapp,* 9 Pick. 495, 516–518. *Commonwealth* v. *Locke,* 335 Mass. 106, 111. Perkins, Criminal Law, 570. On the day before the shooting Cote drove Connolly to New Hampshire, and assisted him in the purchase of a rifle. On the day of the shooting, Cote was transporting Connolly in his automobile which contained the rifle. After standing by and watching Connolly shoot Chwalek five times, and then shoot Sylvia Haggar twice, Cote drove Connolly from the scene, returning shortly thereafter when Connolly fired again at Chwalek. He then assisted Connolly in making his escape from the scene of the shooting. It was open to the jury to find that Cote's conduct was not that of an innocent bystander but rather the conduct of one whose actions facilitated the killing of Chwalek pursuant to a common design. We are of opinion that the judge rightly submitted the question of his guilt to the jury.

11. We have considered all of the questions argued by the defendants and have dealt with such of them as require discussion.

12. We have, in accordance with our duty under G. L. c. 278, § 33E, as amended through St. 1962, c. 453, reviewed the entire evidence and are of opinion that justice does not require a new trial or an entry of verdicts of a lesser degree of guilt. Accordingly the judgments are affirmed.

*So ordered.*

KIRK, J. (concurring). I agree that the judgments should be affirmed. I do not agree, however, that the opinion in point 7 states the law correctly under G. L. c. 233, § 21, in a situation where the conviction is of a lesser offence than the one charged in the indictment. Implicit in the opinion is the proposition that the record of his conviction, which must be read to the jury, may include an *accusation* of a crime of which the witness had not been found guilty or to which he had not pleaded guilty. The proposition is not supported by the cases cited, since they do not concern lesser offence convictions. The proposition is at variance with the first sentence of G. L. c. 233, § 21, which reads, "The conviction of a witness of a crime may be shown to affect his credibility." The fact of conviction must be shown by the record of conviction. The accusation, however, which may appear in the certified record merely as a recital from the indictment or complaint, is totally irrelevant to the fact of conviction unless the accusation coincides with the verdict or finding or plea of guilty. In a typical case, where the conviction was of a lesser offence than the one charged, it would be sufficient for the prosecutor, with the certified record in his hand (available for examination by the judge, counsel or the witness) to inquire of the witness if he is the same person who, to an indictment returned on a certain day, did on a later certain day plead guilty to (or was found guilty of) so much of the indictment as charged assault and battery. The certified copy should not go to the jury room unless the extraneous matter is expunged. The true "record of his conviction" is thus made known to the jury, and no prejudice beyond that contemplated by the statute is done to the witness. This I believe to be the correct rule and is the one which should be and probably is observed in the Superior Court.

There was, however, in my judgment, no error committed by the judge. The case before us was far from a typical case. The trial took twenty-one trial days. It was marked by erratic, unpredictable and obstreperous conduct by Connolly's counsel, a lawyer of experience, culminating in

a contumacious court room castigation of the jury after they had returned their verdicts.[1]

The transcript discloses the following circumstances attending the admission of the records of conviction. Connolly took the stand on the eighteenth trial day. On direct examination he testified that he was guilty of whatever crimes he had been convicted of, naming some of them.[2] On cross-examination, commenced toward the close of the day, the prosecutor offered to show the certified records of conviction to Connolly's counsel who said he did not want to see them. Later he said that he wanted to see each one. Still later he said that he would object to the reading of them but said that he would give no reason. On the following morning the prosecutor read, despite frequent interruptions by counsel, five records of conviction in each of which it appeared that Connolly had pleaded guilty to the offence as charged in the indictment. Then followed the reading of the record of conviction as recounted in point 7 of the majority opinion and counsel's demand that a mistrial be declared.

The transcript shows that the judge had reason to believe from defence counsel's statements that he was familiar with his client's records of conviction. He had reason to expect in the absence of any seasonable notice to the contrary by counsel that the witness would acknowledge a plea of guilty to the crime as charged in the sixth record as he had to the five which preceded it.[3] Having in mind that counsel had earlier said that he would object but would give no reason, the transcript reasonably is susceptible of the interpretation that counsel did know of the objectionable feature, permitted it to be read, and thereupon hoped to get the mistrial which he explosively demanded on the nineteenth day of trial. In these circumstances it should not be said that there was prejudicial error.

---

[1] The judge held the attorney in contempt after the jury were discharged.

[2] The defendant's admission of prior criminal convictions does not make the admission in evidence of the records of conviction themselves unnecessary, cumulative, or error. *Commonwealth* v. *Subilosky*, 352 Mass. 153, 167.

[3] In all, ten records of conviction were read. In each, except the one in dispute, the witness had pleaded guilty to the charge as framed in the indictment.